### S. A. MULLINAX v. J. J. HORD.

(Filed 28 November, 1917.)

**1. Pleadings—Definiteness—Motions.**

Where the complaint sufficiently alleges the negligent acts of the defendant, concerning which damages are claimed in an action to recover for a personal injury, the defendant should ask that the pleadings be made more definite or certain, if such information is required for his defense.

**2. Evidence—Conjecture—Facts in Issue.**

The mere conjecture of a witness as to what one would do under given circumstances should not be received in evidence, especially when it invades the province of the jury in their determination of a fact arising from the evidence.

**3. Negligence — Physicians — Surgeons — Skill Required — Rule of Prudent Man.**

The law requires a physician or surgeon, in the practice of his profession, to have and apply that degree of care and skill ordinarily possessed by members of his profession; and he is liable in damages to his patient for any injury proximately caused by his lack of the requisite knowledge and skill, or the omission to exercise reasonable care, or failure to use his best judgment in his treatment which a practitioner of ordinary prudence would have exercised under the same circumstances.

**4. Same—Evidence—Questions for Jury—Trials.**

In an action against a surgeon for damages alleged to have been caused by his failure to properly treat a patient who had been shot in the foot, evidence tending to show that after he had treated the foot he said no further visit was necessary; that he failed to probe the wound for foreign substances; that a few days thereafter pieces of shoe leather and several shot worked their way out of the wound, causing inflammation, and suppuration ensued, attended with great pain; that, contrary to his diagnosis, the toes of the foot did not properly grow in their natural position, but caused a deformity, and that he did not attend the patient after the first visit, is sufficient to be submitted to the jury upon the question of the defendant's actionable negligence.

**5. Negligence — Contributory Negligence — Parent and Child — Infants — Minors.**

> Where a minor sues a physician and surgeon to recover for injuries caused by his alleged want of attention and unskillfulness in treating a wound he had received, contributory negligence on the part of the father, who had called in the surgeon and was acting as father in behalf of his son, cannot be attributed to the latter; and an, issue as to contributory negligence resting solely on this ground is not a proper one to be submitted to the jury.

CIVIL ACTION, tried before *Cline, J.,* and a jury, at April Term, 1917, of GASTON.

Plaintiff sued to recover damages for injuries to his foot, alleged by him to have been caused by the defendant's want of attention and his unskillfulness as a surgeon in treating and caring for it, after it had been injured by a gunshot wound. The plaintiff complained as follows:

1. That the defendant was, and is, a physician and surgeon, engaged in the practice of his profession in the town of King's Mountain, N. C.

2. On or about 24 December, 1907, plaintiff was accidentally shot, receiving a serious and painful wound in the right foot, which broke the bones and lacerated his foot. He immediately called in and employed the defendant as a surgeon to dress, heal, and cure his foot, whereupon defendant undertook to attend and care for plaintiff's injury.

3. That defendant negligently, carelessly, and unskillfully conducted himself in treating, caring for, and attending plaintiff's injuries, as aforesaid, and by reason of said negligent and careless conduct two of the toes on plaintiff's foot were drawn to one side and crooked, and thereby his foot is greatly deformed, which renders plaintiff a cripple for life.

4. That at the time of plaintiff's injury he asked the defendant to amputate the injured toes and to remove the broken bones from his foot, and plaintiff, being a small child at such time, his father, W. L. Mullinax, who had the care and custody of plaintiff at the time, insisted that defendant as surgeon remove or amputate the injured toes from plaintiff's foot, and defendant neglected and refused to do so.

5. That by reason of defendant's negligent and unskillful treatment of plaintiff's injuries, plaintiff's foot is in a drawn and crooked condition, rendering plaintiff unable to wear an ordinary shoe and compelling him to have shoes made to special order, which has caused him great inconvenience and great mental and physical suffering, and, as plaintiff is informed and believes, his injuries are permanent and he will continue to suffer much inconvenience, bodily suffering, and mental anguish.

6. That, as plaintiff is informed and believes, the carelessness and negligence of the defendant, as aforesaid, is the sole and proximate cause of

his injuries, and he has been disabled from doing profitable work and has been damaged in the sum of $2,000.

Defendant, in his answer, admits "that on or about 24 December, 1907, plaintiff was accidentally shot, receiving a wound in his right foot, fracturing some bones and lacerating the flesh, and admits further that he was called in to attend said wounds, and did treat them," and then he denies all the other allegations of the complaint.

The evidence was, that the defendant did not probe the wound for any foreign substances in it. Plaintiff's father testified, in part: "In answer to your question, was I suggesting to him that I thought the toes ought to be taken off? will say that was my idea. He said he didn't think it was necessary to take them off. As to whether there was any suggestion about probing the place for shot, will say no, I don't think there was, at all. In one sense of the word, that would have been his job. As to whether he made any examination of what might have been in the foot, no, he just clipped off some of those leaders and washed it off. He washed it himself the first time, and bound it up. As to how he came into the house, he generally goes in a hurry, as far as that is concerned; he don't propose to fool away time. I don't remember exactly every word that was said; he called for the bandage and needle and thread. He said he had another call, but he didn't mean to say that he was going before he finished his job there." There was also evidence that defendant stated, after he examined, treated, and dressed the wound, that "it would not be necessary for him to come back." Defendant stated to one of the witnesses, W. L. Mullinax, upon his being asked if he was not going to amputate the toes, one of which was hanging by a piece of skin, that he did not think it necessary, for "it would grow back all right." Plaintiff testified: "He had showed us that the toes would grow back, and said it was not necessary for him to come back, and this was why we did not have him back. Dr. Hord said it was not necessary to come back." There was much other testimony to the same effect. The defendant denied that he had promised to return and see the patient, but he did say that he would do so if any change in the condition of the wound required it; and he further testified: "In answer to your question as to whether or not I mean to say that if I have a patient in a dangerous condition and I consider it my duty to go to see him, that because no one tells me to come back I don't stay away, will say, no, sir. In answer to your question as to whether I neglect my patients, will say, no, sir; I try not to do so." The wound became inflamed a few days after the defendant left, and pieces of the sock and shoe and seven shots worked out. The plaintiff further testified: "It left the little toe sticking right straight up, like that (indicating), and the other one stuck up to the first joint and grew over that way; that small toe was hanging down by a little bit of

skin. There (indicating) is where shot worked out—blue place; here is the scar (indicating) where they came out—seven shots and a piece of the shoe and sock worked out right there (indicating). My father asked him if he didn't think there were some shot up there that he ought to take out, and he clipped some little white leaders, or something. He said he didn't guess there were, and he didn't try to get anything out; didn't probe there or anywhere. My foot was dead; it was hurting a bit. He pulled up the leaders and clipped them off; I reckon they were leaders— some white strings. I called Dr. Hord's attention to my foot afterwards. I was on the street one day, barefooted, and I saw Dr. Hord and showed him my foot, and I said: 'You told me those toes would grow back all right, and you see how they are.' He replied: 'Yes, sticking up a little bit,' and kept right on down the street; he didn't offer to do anything for me; that is all he said—'They are sticking up a little bit.' "

Dr. J. M. Caldwell, defendant's witness, testified: Question—"What would be the proper course for a physician to do under the conditions above stated, with reference to future treatment or returning?" An swer—"I think the physician ought to tell them that he must see the patient again—see the condition of the wound and redress it if necessary. Sometimes a wound heals. When it is thoroughly cleaned out, a wound will heal; sometimes it will not heal at all—will slough off; in that case it needs treatment."

There was other evidence not necessary to be stated. The jury re turned the following verdict:

1. Was the plaintiff, S. A. Mullinax, injured by the negligence or want of skill of the defendant, as alleged in the complaint? Answer: Yes.

2. What damages, if any, is the plaintiff entitled to recover? Answer: Five hundred dollars.

Judgment for the plaintiff, and appeal by the defendant.

*Carpenter & Carpenter and N. F. McMillan for plaintiff.*
*Mangum & Woltz for defendant.*

WALKER, J., after stating the case: We think that the complaint is sufficient to cover the several acts of negligence alleged against defend ant. If it was too general in form, and he wished to be apprised more particularly as to the negligent acts or omissions on his part, he should have asked that the pleading be made more definite or certain, in order that he would not be misled in answering it. But this he failed to do. The requested instruction was, therefore, properly refused. The question excluded by the court had been substantially answered, but it was incom petent, as it called for the expression of an opinion upon matters strictly

within the province of the jury, and which they could easily decide without the aid of his opinion. It was not the subject of expert testimony, but at best the answer of the witness, if given satisfactorily to the defendant, would have been no more than pure conjecture as to what the conduct of a person would be under given circumstances. It would not even be proper opinion evidence. There are but two questions in the case— one as to whether there was any evidence of negligence, and the other as to whether there was any evidence as to contributory negligence.

It is true, as contended by the defendant, that the law does not require of a physician or surgeon absolute accuracy, either in his practice or in his judgment. It does not hold physicians and surgeons to the standard of infallibility, nor does it require of them the utmost degree of care and skill of which the human mind is capable, but that, while in the practice of their vocation, they shall exercise that degree of knowledge and skill ordinarily possessed by members of their profession. *Long v. Austin,* 153 N. C., 508, 510; *Van Skike v. Potter,* 53 Neb., 28. But when a physician consents to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for any injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. *Long v. Austin, supra; Pike v. Honsinger,* 155 N. Y., 201. While it is true that physicians are not responsible for the errors of an enlightened judgment where good judgments may differ, they will be charged with errors, or should be, only where such errors could not have arisen except from want of reasonable skill and diligence. *Jackson v. Burnham,* 30 Pac. Rep., 579; *West v. Martin,* 80 Am. Dec., 107.

Discussing this question in *Staloch v. Holm,* 111 N. W., 264 (cited with approval in *Long v. Austin, supra*), the Court said: "To the ordinary rule that the exercise of defendant's best judgment is no defense in an action for damages caused by his negligence, a general exception is recognized with respect to cases involving matters of opinion and judgment only. A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved, or as to what should have been done in accordance with recognized authority and current practice." The law does not excuse an error of judgment if it occurs by reason of the surgeon's lack of that knowledge

which he should possess in order to qualify him for the practice of his profession, or the negligent failure to exercise the requisite skill and diligence. *Long v. Austin, supra,* where the principles governing such cases are fully discussed.

It is seen, therefore, that a surgeon's duty in treating a wound of his patient is to be measured by both his skill and diligence. If by the lack of that skill which the law requires that he should have he fails to treat his patient properly, so that he is injured thereby or his condition is rendered worse than it would otherwise have been, or if having the requisite skill he negligently fails to use it, or if he is not careful and diligent in the treatment to the extent that he should be so, and as a surgeon of ordinary prudence would have been under the same circumstances, he will be liable for any proximate injury.

The evidence in this case is somewhat conflicting, and it was proper that the jury should have passed upon it and found the facts. If the defendant should have discovered by a sufficiently careful examination that there were foreign particles in the wound, consisting of shots, or cloth and leather from the plaintiff's sock and shoe, and he failed to discover this because he did not exercise the proper care, the plaintiff can recover for any damage to him resulting proximately therefrom. Or if the defendant did know, or should have known by the exercise of reasonable care, skill and forethought, that the wound was in such a condition as to require further attention from him, and he failed to give it, whereby the plaintiff was made to suffer, and his members became deformed and distorted, a condition which would not have arisen if proper care had been exercised, it would entitle plaintiff to damages for the wrong. It is really the application of the ordinary principles in the law of negligence to a case requiring professional knowledge and skill in the performance of the duty which one person owes to another. There is evidence in the record that the proper skill was not employed, and that due care and diligence were not exercised. A surgeon may possess a high order of learning and skill and yet not use them at the proper time or in the proper way. The charge here is that defendant failed to use proper skill, in that a few days after he left inflammation set in and suppuration ensued to such an extent as to cause the plaintiff great pain, and that shots, cloth and leather were expelled from the wound by the effort of nature to relieve itself of those foreign substances, and finally, that the toes of the plaintiff's foot were greatly twisted out of their natural shape and regular position, with resulting pain and inconvenience to him. It is hardly necessary to refer to the evidence in greater detail, or more than to say that there was some from which the jury might find that there was negligence. "The unwarranted abandonment of a case at a critical period, resulting in increased pain and

suffering on the part of the patient, will render the physician liable in damages." 30 Cyc., 1576; *Lawson v. Conway,* 38 Am. St. Rep., 17. He told them it would not be necessary for him to come back, as "the toes would grow back all right," when it appears that this turned out to be wrong advice, or a faulty diagnosis, and misled the plaintiff, to his injury.

As to contributory negligence. We find no evidence of it in the record, and the submission of such an issue would have been futile. There are cases decided by courts, whose opinions are entitled to the highest respect, which hold that the negligence of a father is imputable to the child, upon the ground that he is a keeper, or agent, to whom discretion in the care of his minor child is confided, and for this reason, and in respect to third persons, his act must be deemed to be that of the infant—his neglect, the latter's neglect. *Hartfield v. Roper,* 21 Wendell (N. Y.), 615, 619 (34 Am. Dec., 273); *McGarry v. Loomis,* 63 N. Y., 104 (20 Am. Rep., 510).

This doctrine is still recognized in a number of other States. 29 Cyc., 552, and note 75. But it has not been approved in a majority of the States. It is said in 29 Cyc., at p. 553, 554: "According to the great weight of authority, in an action brought for the benefit of a child who has sustained injuries through the negligence of another, negligence on the part of the parents or those standing *in loco parentis* will not be imputed to the child nor bar a recovery by him. The rule announced in *Hartfield v. Roper* has received severe condemnation in many of the courts repudiating it as authority, and is very generally regarded as unsound by text-writers."

In his book on Negligence, Judge Thompson says of this doctrine: "An adult person, when he commits his person to the custody of another, does so at least voluntarily; an infant does not select his custodian, it is selected for him by the laws of nature, or by circumstances beyond his control. Certainly, there is no reason why the ordinary principle that where one is injured by the concurring negligence of two persons, he has an action against either or both, should not apply in the case of an injury to a child, unless the imputation is to be put upon the law of denying the feeble and helpless infant the same measure of protection which it accords to adults."

It is further said in 29 Cyc., at p. 555, 556: "While in most jurisdictions negligence of parents, or others *in loco parentis,* cannot be imputed to a child to support the plea of contributory negligence, when the action is for his benefit, yet when the action is by the parent, in his own right, or for his benefit, as when he sues as administrator, but is also the beneficial plaintiff or *cestui que trust* of the action as distributee of the child's estate, the contributory negligence of the parent may be shown

in evidence in bar of the action." But this Court repudiated the New York doctrine, and has adopted and adhered to the rule which is stated above to be that which is supported by the great weight of authority. *Bottoms v. R. R. Co.,* 114 N. C., 699.

*Justice Shepherd* carefully reviews the authorities in that case, and logically reaches the conclusion that the New York doctrine is not sound and has been rejected by a large majority of the courts. Quoting from Beach on Contributory Negligence, 42, he says: "It is a principle of law laid down before the spacious days of great Elizabeth, that the abuse of an authority derived from the law shall not work harm to or prejudice the rights of the person subjected to it. The parent's authority is given for the protection of the child, but the principle of *Hartfield v. Roper* turns the shield into a sword and uses it to deprive the child of the very protection arising from the parental relation." He then quotes from other authorities as follows: "The doctrine announced in this case (*Hartfield v. Roper*) has been followed in some jurisdictions, but the modern tendency is to reject it, and to hold the negligent injurer liable for the consequences of his own wrongful act regardless of the contributory negligence of the child's parent or guardian." Wood on Railroads, sec. 322. And Bishop on Noncontract Law, 582, says: "It is as flatly in conflict with the established system of the common law as anything possible to be suggested. An examination of the leading text-books which treat of negligence will disclose that it is also disapproved as being contrary to principle and reason as well as the rapidly accumulating weight of authority," citing Wharton on Negligence, 312-314; Pollock on Torts, 299; Cooley on Torts, 981; 2 Thompson on Negligence, 1184; 1 Sh. & Redf. on Negligence, sec. 66-75.

The doctrine of *Hartfield v. Roper* has been characterized as being opposed to every principle of reason and justice (*Whirly v. Whiteman,* 1 Head., 610), and repulsive to our natural instincts, and unfair to that class of persons whose unfortunate circumstances and the condition of poverty require them to support life by their daily toil. *Kay v. R. R. Co.,* 65 Pa., 269.

Chief Justice Beasley of the New Jersey Court, after exposing the fallacy of basing such a doctrine on the ground of agency, proves that it is utterly untenable by a convincing argument, and which, he says, conducts us to the rather absurd conclusion of making an infant in its nurse's arms answerable for all her negligence while she is employed in its service, and closes with this language: "Every person so damaged by the careless custodian would be entitled to his action against the infant. If the neglect of the guardian is to be regarded as the neglect of the infant, as was asserted in the New York decision, it would from logical

necessity follow that the infant must indemnify those who should be harmed by such neglect."

It is also said by Justice Shepherd: "Although a child of tender years may be in the highway through the fault or negligence of his parents, and so improperly there, yet if he be injured through the negligence of the defendant he is not precluded from redress. 'All,' says Judge Red-field, in *Robinson v. Cone,* 22 Vt., 213, 'that is required of an infant plaintiff in such a case being that he exercise care and prudence equal to his capacity.' This rule is also laid down in *R. R. Co. v. Gladman,* 15 Wall., 401," which is cited with approval in *Murray v. R. R. Co.,* 93 N. C., 92.

The doctrine approved generally by the text-writers and the Courts is thus commented on in 1 Sh. & Redf. on Negligence, secs. 66-78: "The Vermont rule, as it is called, commends itself to our judgment and is abundantly justified by the reasoning of the Courts which have adopted it. . . . It should be fully applied to such cases, giving to defendants who suffer from its hardships the same consolation which courts administer to plaintiffs when nonsuiting them—that their case is very hard and deserves sympathy, but that the law must not be relaxed to meet hard cases." "If, where one of two innocent persons must suffer, the law puts the loss, as it justly does, upon the one who has by some negligence enabled the wrong to be done, surely when there are two guilty persons in the transaction the law should not leave the only innocent one to suffer, as it practically does, by referring him to his parent or guardian for an injury of which a stranger has been the principal cause." (Sections 77, 78.) "No injustice can be done to the defendant by this limitation of the defense of contributory negligence since the rule itself is not established primarily for his benefit, and he can never be made liable if he has not been himself in-fault." (Section 73.)

The Vermont rule has been adopted, or at least favorably considered, as to one or more of its features, in the following cases: *Greer v. Lumber Co.,* 161 N. C., 144; *Alexander v. Statesville,* 165 N. C., 527; *Raines v. R. R. Co.,* 169 N. C., 189, and *Foard v. Power Co.,* 170 N. C., 48. It also may be said that the Courts which have adopted the New York rule have subjected it to so much criticism and qualification, in order to escape its harshness and injustice, that but little of it remains in its original similitude. Its former vigor has been greatly impaired, if not virtually destroyed, because its excessive rigor was too apparent. *Bottoms v. R. R. Co., supra.*

In our case, the father had assumed control of his child after his injury, and was taking care of him, having himself employed the physician to treat and cure his wound. The child was in no position, and in no condition, to act for himself, and had the right to rely upon his

parent, who was supposed to be more experienced and more likely to do what was best for him. In all that we have said, we do not mean to imply that even the father was at all negligent, but for the saké of argument and of testing the correctness of the plaintiff's position, we have assumed that he had not taken proper care of his son.

Reviewing the entire case, we find no error in the record.