Plaintiffs sought to recover damages for malpractice of defendants, physicians and surgeons, in wrongly and negligently diagnosing the feme
plaintiff's pregnancy as a case of fibroid tumor of the uterus or an ovarian tumor. There was much evidence taken at the trial upon the questions of negligence and damages as to each of the two defendants, and the jury returned the following verdict: *Page 504 
"Were the plaintiffs injured by the negligence or want of skill of the defendants, or either of them? Answer: `No.'"
There were two other issues as to the damages each of the plaintiffs was entitled to recover, but as the verdict upon the first issue was adverse to them they were, of course, not answered, as it was not necessary that they should be. It is alleged in the complaint that the doctors, after their examination had been made — each acting separately in making it, and consulting thereafter together in regard to it — reported that thefeme plaintiff was suffering from an ovarian tumor of rapid and malignant growth, and that an immediate operation was necessary, and that when the incision in the abdomen was made so that the ocular proof of her condition was afforded and her real trouble was disclosed it was found that there was no tumor, but that instead she was between four and five months advanced in pregnancy. That for the purpose of the operation she was taken, under the advice of Dr. Ring, to the Twin City Hospital at Winston-Salem, where Dr. A. de T. Valk resided, and where, in the hospital, he first made his examination of her and pronounced her ailment that of an ovarian tumor of rapid growth, calling for an immediate operation.
It is further alleged that when they were informed by the physicians and surgeons as to the cause of the feme plaintiff's then physical condition, both plaintiffs urged that she go to the hospital at Baltimore for further diagnosis and treatment, when Dr. Ring protested against such a course, and insisted that, in view of the seriousness of her trouble, she be carried at once to Winston-Salem, as delay would be dangerous, if not fatal; he further asserting that Dr. Valk was the most (479) skillful surgeons in the State, and all would be well. That, after both examinations had been completed, the defendants declared that their knowledge of her case was sufficient; their diagnosis was positively correct; that they knew what they were doing; that no further diagnosis was necessary or required; that they knew for a certainty that an ovarian tumor existed and that it required an immediate operation to prevent death. That upon this representation, and trusting to the skill and ability of her physicians and surgeons, the plaintiffs yielded to their advice, the feme plaintiff submitting to the operation with her husband's consent, and the same was performed with the result above stated. That morphine was injected into her arm and anesthetics administered until she was sufficiently under their influence, when the incision, eight or ten inches in length, was made in the abdomen, which exposed the internal organs and showed the diagnosis to be false, as thefeme plaintiff was only normally pregnant, and there was no indication of tumor. The surgeon's wound was closed, the patient recovered of it, and in due course was delivered of her child without any untoward *Page 505 
incident in the accouchement. She afterwards, within the usual period, was restored to her normal health.
It is further alleged "That the defendants negligently performed the operation without possessing or exercising the knowledge and skill possessed by the ordinary physician in surgery, and without possessing and exercising this knowledge did negligently and carelessly undertake to diagnose and determine the condition of the feme plaintiff; and did, without possessing and exercising the skill and knowledge possessed and exercised by the ordinary physician and surgeon, carelessly, negligently, and erroneously diagnose and determine that the said feme plaintiff was suffering from an ovarian tumor of rapid growth, when in fact she was not so suffering, and that the defendants knew or should have known it by the exercise of the ordinary knowledge and skill possessed by the average physician and surgeon," thereby requiring long confinement of feme
plaintiff to her bed and causing her great bodily pain, and also mental anguish in many ways, which are particularly set forth, and the loss of services and other benefits, to her damage ten thousand dollars.
The defendants distinctly and circumstantially denied, except in one respect, each and every allegation of negligence or malpractice, and the existence of any fact tending to show it, or to prove that they acted otherwise than the most careful and skillful physicians or surgeon would have done under like circumstances, and also denied all right to damages, and this denial made up the issues submitted to the jury.
The complaint was amended so as to allege that the incision was too long, and that this error in operation caused hernia, which it appears developed some time after child-birth. This also was (480) denied.
We will now state, in substance, the contentions of the parties, with such allusions to the testimony as may be thought proper to give a clear apprehension of the case from the two different standpoints:
The plaintiffs contended that, upon the evidence, it appeared that thefeme plaintiff was not suffering from tumor of any kind, but was in a normal condition, with the exception of the unusual menstrual flow during her state of pregnancy, and the fact that she experienced no symptoms, such as nausea, and so forth, indicating that she was pregnant. That the surgeons had made an exceedingly superficial diagnosis, and one not calculated to disclose, with any reliable degree of certainty, her real condition, and that in not making a closer and more minute examination of her body, as a careful physician of ordinary knowledge and capacity would and should have done, they were misled by their own fault in this respect, and thereby caused the feme plaintiff great and unnecessary suffering of mind and body, and her husband *Page 506 
great mental anguish and the loss of her society and services, and subjected him to great expense laid out in her cure and restoration to health. They assert that defendants should have been more skillful and careful in their diagnosis and treatment of their patient, especially in view of the urgent appeal made to them by plaintiffs that she be taken to Baltimore for further observation and study of her case, which they predict would have resulted in a different diagnosis and the ascertainment of her real condition, and would have saved her from the serious operation she underwent and its attendant suffering and anxiety, and left her in a normal state of health and strength to withstand and overcome the perils of pregnancy and child-birth. They also complain of the herein which followed the useless operation to which she was subjected. They allege, with testimony to support them in their contention, that there were other well-known, tests for determining a case of pregnancy which were not resorted to by the defendants, and that in all they did there was a total lack of proper care, caution, knowledge and skill, which resulted in her injury; and further and lastly, that they did not give their consent to an exploratory operation, but having been assured of the presence of a malignant tumor requiring immediate surgical interference to save life, they consented, and she submitted only to that kind of operation, relying upon the superior knowledge and skill of the defendants to acquaint them with the facts and to advise as to the proper course to be taken.
The defendants, on the contrary, contend, and refer to evidence to sustain them, that the sole theory of the complaint was a negligent mistake in diagnosis, in that the defendants, thinking the feme plaintiff had an ovarian cyst or tumor, operated on her for that condition (481) when in fact she was pregnant, which was disclosed at the time of the operation. The contention of the defendants was that it was very difficult to determine the true condition of the feme plaintiff, and that in their opinion the indications were that it was an ovarian tumor or cyst, but that the true condition could not be determined other than by an exploratory operation, and that this was the nature and character of the operation. The feme plaintiff is a married woman forty-seven years old, and prior to the date of her visit to Dr. Ring at Elkin on 8 January, 1917, had given birth to three children at intervals of three and two years, and that at these births conditions were normal, the last of the children having been born twelve years prior to her visit to Dr. Ring; that from the date of the birth of the last child until the latter part of August, 1916, the feme plaintiff was regular in her periods, and that on or about 21 September, 1916, was noticed the first irregularity, the period at that time being partially suppressed, continuing with slight but constant flow, and broken by periods of one *Page 507 
or two days with an absence of flow, with the exception of one week; these conditions continued until 8 January, 1917. That at the time of her visit to Dr. Ring the feme plaintiff herself had not observed any signs of pregnancy, but thought she had a tumor, and so stated to Dr. Ring, at the same time also stating to him the history of her case as just detailed. There was an apparent enlargement of the abdomen. Without coming to a definite conclusion as to the true condition, but strongly suspecting a tumor, Dr. Ring advised that she go to Winston-Salem for consultation with Dr. Valk, looking to an operation. On 12 January, 1917, Mr. and Mrs. Brewer, accompanied by Dr. Ring, came to Winston-Salem, and went to the Twin City Hospital, arriving late in the afternoon. After supper Dr. Valk made an examination of Mrs. Brewer, she at the time being undressed and in bed. (Dr. Ring had made his abdominal and vaginal examination of the patient while she was standing in an erect position.) Dr. Ring then gave Dr. Valk the history of the case that he had received. In addition to the information received from Dr. Ring, Dr. Valk was told by Mrs. Brewer that she had not had any pain or nausea, and that there had been no cancer or tuberculosis in the family. Mrs. Brewer at the time gave to Dr. Valk practically the same history, only in greater detail, that she had given to Dr. Ring, Mrs. Brewer stating to Dr. Valk her belief that she had a tumor. Dr. Valk made a vaginal examination with the patient in bed, and also made an external examination, the vaginal examination being made with the right hand on the abdomen and the two fingers of the left had in the vagina, which disclosed a rather indefinite mass in the lower part of the abdomen, the mass being smooth, inclining to be a little harder on the right side than on the left. This mass was attached to the neck of the womb or cervix, which was exceedingly hard, and at that time the patient was bleeding. As a (482) result of this examination, Dr. Valk diagnosed it as a sub-mucuous fibroid tumor, or possibly a cyst. There were two examinations made by Dr. Valk, one after supper of the day of the arrival the next one the second or third day afterward. Dr. Valk reported to Mr. Brewer his diagnosis, qualifying it by the statement that he was not sure of the condition, and suggesting an exploratory incision, meaning by that an incision for opening the abdomen with a view to ascertaining the true condition. The real point at issue in this case was the allegation of wrongful or mistaken diagnosis. Upon this point all of the physicians agreed that there were conditions under which the diagnosis and conclusion as to the choice between pregnancy and tumor is attended with extreme difficulty, and that all physicians make mistakes in that respect. Six physicians other than the defendants, testifying for the defendants, and one physician testifying for the plaintiff, stated *Page 508 
that, under the circumstances of this case, it was extremely difficult to know the true condition, and all of defendants' experts agreed that under the circumstances an exploratory operation was not only the wisest course to pursue but was necessary and in entire accord with good practice. Two physicians testified for the plaintiff, Drs. Duncan and Choate. The latter was not asked for his opinion or views upon the question of diagnosis, his testimony dealing entirely with hernia. Dr. Duncan was asked by the plaintiff a hypothetical question to ascertain his opinion as to whether the defendant Ring was guilty of negligence, and his answer was, "On account of the abnormal conditions, I am of the opinion that he did use ordinary skill." The abnormal condition to which the doctor referred was the continuous flow. Among the physicians testifying for the defendants were Dr. H. F. Long, of Statesville; Dr. J. M. Reece, of Elkin; Dr. F. H. Gilreath, of Wilkesboro; Dr. A. J. Williams, of Greensboro, and Drs. W. L. Grimes and W. M. Johnson, of Winston-Salem. Drs. Long, Grimes, and Williams are specialists in surgery. Drs. Reece, Gilreath and Johnson are general practitioners. Dr. Ring made the somewhat remarkable statement that he had delivered about 3,000 women and that only one was over the age of forty-seven years. Dr. J. M. Reece stated that he had delivered approximately 2,500 and, with the exception of Mrs. Brewer, he had delivered only one other over forty-seven years of age. There was no dispute among the physicians but what ventral hernias appear in a woman who had not had an abdominal incision. It was likewise agreed that if the hernia in this case was in any way attributable to the incision, it would in all probability have appeared at or shortly after the birth of the child, the fact being that in this case Mrs. Brewer did not observe any signs of the hernia for several months after the birth (483) of the child. Mrs. Brewer was attended by Dr. J. M. Reece. The birth of the child was entirely normal in every respect. Upon the question of the propriety of the exploratory operation, we quote from the testimony of Dr. H. F. Long: "When a physician cannot ascertain and make out the condition of the patient by a diagnosis to his entire satisfaction according to the ordinary gentle methods, such as palpitation externally and a very slight vaginal examination, and, above everything, a very careful history of the case by the patient's own statement, and if after recording the history and making the ordinary abdominal examination with the finger, called the digital examination, he is then in doubt, he is warranted in making an exploratory incision. Contrasting the dangers of letting the condition alone, whatever it may be, when there is a suggestion of pregnancy and tumor, and when there is bleeding, I should say the question should be settled, because the bleeding may mean death on short notice." Dr. Long, together with *Page 509 
other physicians, expressed the opinion that the operation did not cause the hernia.
This recital presents fairly the material questions in the case, according to the versions of the respective parties, as stated in their briefs. There was a judgment upon the verdict, and the plaintiffs appealed.
We have stated that the defendants denied categorically all allegations of negligence or want of skill, except in one instance. The seventh section of the complaint charged negligence and a lack of proper or ordinary skill as against Dr. J. W. Ring, and in his answer to that paragraph he admitted the charge. Defendant asked that he be allowed to amend and substitute a denial, as the admission was manifestly an inadvertence. The request was allowed, and the pleading accordingly amended. Plaintiff afterwards offered the originals of the section and the answer thereto in evidence. On objection of the defendant, they were excluded. This may have been error, although the admission, when considered with the other parts of the pleading and the circumstances under which the admission was made, was the very slightest proof, if proof at all, of the fact of negligence. We will assume it was error to exclude this evidence, and when we do so we find no substantial or prejudicial effect in the ruling. If we read the entire pleading it is as plain as it could possibly be that the word "admitted" was substituted for "denied" by the clear inadvertence or misprision of the clerk, stenographer, or typewriter who copied the pleading or by the pleader himself, if in his own handwriting. The context shows, without the shadow of a doubt, what (484) was meant. The charge of negligence was made more than once and each time, except the one in question, it was emphatically denied. The judge may have erred, and perhaps it would have been better to have admitted the papers in accordance with our settled rule, but the ruling was such a slight, infinitesimal and attenuated departure from the correct line of decision, as fixed by us in such cases, that we count it as having no appreciable weight in contributing to the general result. No one could well read the answer of Dr. Ring without clearly understanding that both defendants, who acted in cooperation, intended to make sweeping denial of each and every allegation of negligence or a want of knowledge and skill, and such a denial constituted the warp and woof of their pleading. Courts do not lightly grant reversals, or set aside verdicts, upon grounds which show the alleged error to be *Page 510 
harmless or where the appellant could have sustained no injury from it. There should be at least something like a practical treatment of the motion to reverse, and it should not be granted except to subserve the real ends of substantial justice. Hilliard on New Trials (2 Ed.), secs. 1 to 7. The motion should be meritorious and not based upon merely trivial errors committed, manifestly without prejudice. Reasons for attaching great importance to small and innocuous deviations from correct principles have long ceased to have that effect and have become obsolete. The law will not now do a vain and useless thing. S. v. Smith, 164 N.C. 476; Schas v. Asso.Society, 170 N.C. 420, 424. It is said in 3 Graham and Waterman on New Trials, 1235: "The foundation of the application for a new trial is the allegation of injustice, and the motion is for relief. Unless, therefore, some wrong has been suffered there is nothing to be relieved against. The injury must be positive and tangible, not theoretical merely. For instance, the simple fact of defeat is in no sense injurious, for it wounds the feelings. But this alone is one sufficient ground for a new trial. It does not necessarily involve loss of any kind, and without loss or the probability of loss there can be no new trial. The complaining party asks for redress, for the restoration of rights which have first been infringed and then taken away. There must be, then, a probability of repairing the injury, otherwise the interference of the court would be but nugatory. There must be a reasonable prospect of placing the party who asks for a new trial in a better position than the one which he occupies by the verdict. If he obtains a new trial he must incur additional expense, and if there is no corresponding benefit he is still the sufferer. Besides, courts are instituted to enforce right and restrain and punish wrong. Their time is too valuable for them to interpose their remedial power idly and to no purpose.
They will only interfere, therefore, where there is a prospect of (485) ultimate benefit." Hulse v. Brantley, 110 N.C. 134; Alexander v. N.C. Trust Co., 155 N.C. 124; McKeel v. Holloman,163 N.C. 132. See, also, Grice v. Ricks, 14 N.C. 62; Gray v. R. R.,167 N.C. 433. Tried by this rule, so well stated by that standard authority, the objection cannot be sustained. The judge had the discretion to permit the amendment, and we do not review the exercise of the same, in the absence of gross abuse, which certainly does not appear here. Pell's Revisal, Vol. I, secs. 505, 507, and notes of cases. The Code policy as to amendments is a liberal one and the discretionary power of the court is given to secure and promote a trial upon the merits and to prevent a failure of justice. Blalock v. Clark, 133 N.C. 309; Reynolds v. R. R.,136 N.C. 345. See Pell's Revisal, Vol. I, p. 237, sec. 507, for other cases. This disposes of assignments of error A and B.
We are unable to discover how the evidence as to the hernia worked *Page 511 
any harm to the appellants, as it related solely to the issues as to damages, and they lost their case on the first issue. If there is no cause of action there are no damages. The ruling, if erroneous, was, for the reason just stated, without any prejudice. Butts v. Screws, 95 N.C. 215;S. v. Smith, supra; Collins v. Collins, 125 N.C. 98; May v. Gentry,20 N.C. 249; Gray v. R. R., supra. If erroneous it was rendered harmless by the verdict. Graves v. Trueblood, 96 N.C. 495; Vickers v. Leigh,104 N.C. 248; Perry v. Ins. Co., 137 N.C. 402. It was competent to examine the medical experts upon questions relating to their particular science. We could obtain reliable information upon scientific subjects in no other way, and the jury would be left to guess or grope in the dark, instead of having trustworthy knowledge as to these special matters of inquiry, if their opinions were not admitted for the purpose of enlightening the jury upon such questions as are peculiarly within their knowledge, which they have acquired by actual study, experience and practice. Lawson on Expert and Opinion Evidence (2 Ed.), p. 123;S. v. Slagle, 83 N.C. 630; S. v. Sheets, 89 N.C. 543; S. v. Bowman,78 N.C. 509; S. v. Secrest, 80 N.C. 450; S. v. Cole, 94 N.C. 958; S. v.Wilcox, 132 N.C. 1134. It was, therefore, competent to ask the witness whether, in his opinion, upon the facts stated in the hypothetical questions, if found by the jury upon the evidence, the diagnosis was made according to the approved practice and principles of the medical profession. Rogers on Expert Testimony (2 Ed.), sec. 64; Twombly v.Leach, 11 Cash (Mass.) 405; Wright v. Hardy, 22 Wis. 348; Hoenerv. Koch, 84 Ill. 408; Mertz v. Detweiler, 8 W. S. (Pa.) 376; Heath v.Glisan, 3 Oregon 67; Roberts v. Johnson, 58 N.Y. 613, 615; Mayo v.Wright, 63 Mich. 32; S. v. Bowman, supra; Sawyer v. Berthold,116 Minn. 441; Sly v. Powell, 87 Kan. 142; Taylor v. Kidd, 129 Pac. (Wash.) 406. It has been held competent to ask whether an (486) autopsy had been properly made, S. v. Moxley, 102 Mo. 386; whether it was necessary to remove one eye to save the sight of the other, which was endangered by sympathetic inflammation, Reid v.City of Madison, 85 Wis. 667; whether a limb of the patient was or not in as good condition as the average of those treated by skillful physicians or surgeons in like cases, Olmstead v. Gore, 100 Pa. 127; and there are in the books other apt illustrations which are almost without number.
Expert testimony as to malpractice cases are well considered and discussed in Rogers on Expert Testimony (2 Ed.), at p. 148, sec. 64. It is not the province of an expert to draw inferences of fact from the evidence, but simply to declare his opinion upon a known, admitted or hypothetical state of facts. U.S. v. McGlue, 1 Curtis 1; Heald v. Thing, 45 Me. 392; 1 Greenleaf on Evidence, sec. 440; 1 Wharton on *Page 512 
Ev. 452; Wharton's Cr. Law, sec. 50f; S. v. Wilcox, supra; Summerlin v. R.R., 133 N.C. 554; S. v. Bowman, supra. The rule is that the expert must base his opinion upon the supposition that the jury will find the facts recited in the hypothetical question, and there must be evidence of those facts. Rogers on Expert Testimony, sec. 27; S. v. Bowman, supra; S. v.Cole, supra; S. v. Wilcox, supra; Woodbury v. Obear, 7 gray (Mass.) 457;Com. v. Rogers, 7 Metcalf (Mass.) 500; Summerlin v. R. R., supra. If the plaintiffs objected to the questions addressed to the doctors because it had not been shown that they were experts, they should have made it known, as they cannot be silent when they should have spoken and after verdict advance the objection on this ground for the first time. Summerlin v. R.R., supra. If they had intended to rely on any such ground, and had stated such an intention to the judge, he would have heard the preliminary proof, found the facts and decided upon their competency as experts. Summerlincase, supra. But the physicians were all experts, as the evidence overwhelmingly shows. The court expressly found that Dr. Duncan was an expert, and it was to the questions propounded to him as such that the objection just considered was directed. The answers given by the experts were all competent, as they were the expressions of their opinion upon the question of malpractice, and as to whether the diagnosis was properly and sufficiently made; also as to whether the two diagnosticians should have detected the pregnancy during the course of their examinations or by the use of the ordinary skill and the medical knowledge of an average practitioner.
This brings us to the question of issues, requests for instructions, and the charge of the court. The issues submitted were sufficient to develop the entire case equally for both parties, and where this is so the rejection of other issues tendered is not error. The form and number (487) of the issues is within the sound discretion of the court, provided they are sufficient to determine the rights of the parties and to support the judgment. Hatcher v. Dabbs, 133 N.C. 239; Garrison v.Machine Co., 159 N.C. 286; Warehouse v. Ozment, 132 N.C. 848; Clarkv. Guano Co., 144 N.C. 71; Patterson v. Mills, 121 N.C. 258; Pretzfelderv. Ins. Co., 123 N.C. 164; Strauss v. Wilmington, 129 N.C. 99. There was sufficient averment in the pleadings to distinctly present the questions in controversy, and they could well have been considered under the issues, which were adopted by the court. Hatcher v. Dabbs,supra. The plaintiffs seem, by their prayers for instructions, to have considered the first issue as sufficient. They alleged that they consented only to the operation for tumor, and were fraudulently misled by the defendants. We do not think the evidence supports any such theory. The prayer for instruction, which was refused and is covered by exception *Page 513 
No. 12, is confusing and somewhat contradictory. It assumes in one part that a very serious operation was to be performed for tumor, to which plaintiffs assented and the feme plaintiff submitted, and in another part, that they were not informed of the serious operation, so that the jury would have been misled by its form and language, if the instruction had been given. It appears also that the plaintiffs clearly consented to the operation and fully understood the situation, and the feme plaintiff had said enough to the physicians as to her condition to induce them to go on with it. They performed the operation with a double purpose, first to explore and discover the true condition, and then to operate further and more extensively if the situation proved to be serious and called for immediate and drastic treatment. This apparently was the understanding of all parties. But whether so or not, the instruction should not have been submitted as asked to be given. Dr. Duncan, the plaintiff's own witness, testified, and he concurred with the other doctors in this respect, that Dr. Ring used proper skill and judgment in making the diagnosis. He also said that the peculiar and abnormal conditions might well have misled the two doctors when they made their examination and formed their opinion, especially mentioning as one of these conditions the continuance of the menstrual flow after pregnancy. Dr. Choate, plaintiff's witness, stated that ventral hernia arises sometimes from other causes than an abdominal incision. Dr. Valk testified: "Q. What do physicians and surgeons possessing and exercising the knowledge and skill ordinarily possessed by the average physician and surgeon do when there is a suggestion of either pregnancy or tumor with respect to an exploratory operation or the by-manual examination to ascertain the true condition? A. It is a question of whether they should attempt any examination through the vagina or through the neck of the womb; it might bring about a miscarriage or an abortion. If they should make the incision, the harm to the (488) patient is practically none." The doctors all agreed, except Dr. Choate, a young physician, that the hernia was not caused by the incision, and he seems to have doubted his own opinion as the hernia came later than was to be expected. But the evidence as to hernia was rendered immaterial by the verdict on the first issue.
We may now well consider what are the duties and responsibilities of a physician and surgeon in the diagnosis of a case and the treatment of a patient under his care. A physician entitled to practice his profession, possessing the requisite qualifications and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions *Page 514 
involved or as to what should have been done in accordance with recognized authority and good current practice. Whether errors of judgment will or will not make a physician liable in a given case depends not merely upon the fact that he may be ordinarily skillful as such but whether he has treated the case carefully and has employed in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession. There is a fundamental difference in malpractice cases between mere errors of judgment and negligence in previously collecting data essential to a proper conclusion, or in subsequent conduct in the selection and use of instrumentalities with which the physician may execute his judgment. If he negligently omits to inform himself as to the facts and circumstances, and injury results therefrom, then he is liable. 30 Cyc. 1578-9, at 13; Stalock v. Holm, 100 Minn. 276; Johnsonv. Winston, 68 Neb. 425. The case of Just v. Littlefield, 87 Wn. 299, a well-considered and well-reasoned one, was much like our case in its facts. It was stronger for the plaintiff, because of the fact that other physicians had diagnosed the patient's complaint as that of tumor instead of pregnancy, and this was known to the defendant, who afterwards pronounced it a tumor and operated to find if he was correct, and to remove the tumor and treat the disease if he was. Judge Holcomb, with the concurrence of all his associates, said: "At all events it would seem that, whether appellant did, under the circumstances and conditions shown to exist, proceed with due and ordinary care in treating the patient, was a question of fact for the jury." He then further says: "The principal question here in whether a physician is, as a matter of law, liable for a wrong diagnosis and ensuing treatment based thereon, even where there may be an honest difference of opinion among members of the medical profession as to the diagnosis, if the diagnostician proceeded with due care, skill and diligence in treating (489) the patient. The law is, of course, well settled that a physician is liable for a wrong diagnosis of a case, resulting from a want of reasonable skill or care on the part of the physician, and followed by improper treatment, to the injury of the patient. But unless improper treatment follows a wrong diagnosis gives no right of action." 30 Cyc. 1575; 5 Thompson Negligence, sec. 6717; Richardson v. Carbon HillCoal Co., 10 Wn. 648. There is an elaborate and most excellent note to that case, with a citation and a review of numerous decisions of the courts upon this important subject, with the following statement of the rule as the annotator's text: "A physician is not held to a higher degree of responsibility in making a diagnosis than in prescribing treatment, and is not liable in damages for an error of judgment in making a wrong diagnosis of a disease in the absence of a failure to exercise reasonable care and proper professional skill." It would seem to be unnecessary to *Page 515 
prolong this opinion with any further reference and discussion of the authorities, as we availed ourselves of the occasion to treat this question at length in the two recent cases of Long v. Austin, 153 N.C. 508, andMullinax v. Hord, 174 N.C. 607.
Upon the general question as to the competency and value of expert opinions of other physicians and surgeons we may refer to Sawyer v.Berthold, 116 Minn. 441; Sly v. Powell, 87 Kan. 142; Taylor v. Kidd, 129 P. 406. As to the use of the X-ray, McGraw v. Kerr, 23 Colo. App. 163, and in this connection it may be said that Dr. Long stated that the ray would be of no service at that stage of the pregnancy. Whether the foetus was quick with life, so that the beatings or sounds of the heart could be detected by examination, was a question of fact for the jury to decide upon the evidence, as were the other questions involved (30 Cyc. 1588). Dr. Long stated that in some cases they cannot be heard, depending somewhat upon the conformation of the woman and her physical development, and that the seventh month is the average time for such manifestations.
In this case importance is attached by the experts to the statement of this good woman as to her condition and symptoms. She was clearly misled by the unusual symptoms, although she was the mother of three children, as it seems never to have occurred to her that conception had taken place and that she was in a delicate condition. We can well understand then — with all of this strong and almost irrefragable testimony in favor of the doctors who diagnosed her trouble — how the jury reached the conclusion that they had not been negligent or unskillful, and gave them the verdict. While we may sympathize with the feme
plaintiff and deeply regret her misfortune, our plain duty is to execute justice not based upon anything but the law and the evidence in the case. There has been a loss, no doubt, but no legal wrong (490) or injury. The case was correctly tried.
No error.
Cited: Powell v. R. R., 177 N.C. 248; Bank v. Pack, 177 N.C. 390;Campbell v. Sloan, 179 N.C. 82; Rierson v. Iron Co., 184 N.C. 366, 370;Fay v. Crowell, 184 N.C. 417; S. v. Maynard, 184 N.C. 659; Bank v.Yelverton, 185 N.C. 317; Barbee v. Davis, 187 N.C. 82; Nash v. Royster,189 N.C. 414; Hunt v. Eure, 189 N.C. 493; Godfrey v. Power Co., 190 N.C. 30,32; Dorsey v. Corbett, 190 N.C. 785; S. v. Martin, 191 N.C. 403;Bowmen v. Worthington, 191 N.C. 471; Covington v. Wyatt, 196 N.C. 372;McCord v. Harrison-Wright, 198 N.C. 746; Childers v. Frye, 201 N.C. 45;S. v. Caudle, 201 N.C. 86; Munday v. Bank, 211 N.C. 277; Rooks v. Bruce,213 N.C. 59; Cody v. Hovey, 217 N.C. 413; Gold v. Kiker, 218 N.C. 208;Barrett v. Williams, 220 N.C. 33; *Page 516 Love v. Zimmerman, 226 N.C. 392; Gray v. Weinstein, 227 N.C. 465;Spivey v. Newman, 232 N.C. 284; Bruce v. Flying Service, 234 N.C. 84;Waynick v. Reardon, 236 N.C. 120; Cotton Mills v. Local, 578 N.C. 251-230;Teague v. Power Co., 258 N.C. 764.