## JOHN M. CAMPBELL v. B. J. SLOAN.

### (Filed 20 December, 1919.)

**1. Principal and Agent—Sales—Commissions—Lease—Evidence—Questions for Jury—Trials.**

Where there is evidence tending to show that a real estate dealer was employed by the owner, as his agent, to negotiate with the United States Government to lease his hotel property to the Government for general hospital purposes, and that in pursuance thereof the lease was finally effected by the owner, in the absence of the agent but through his efforts, for a tuberculosis hospital, requiring the expenditure of money for alterations, etc., at a greatly increased and profitable rental; but that pending the negotiations the Government officials wrote that the property "would not meet any present need of the Department": *Held*, it was for the jury to determine, as to the commissions sued for by the real estate agent, and upon the evidence, whether the trade as finally consummated was within the agreement, or procured through his efforts, or whether the owner acted independently, after the agent had failed in effecting a separate lease, as originally contemplated.

**2. Principal and Agent—Sales—Commissions—Principal's Denial of Liability.**

Where a real estate agent has procured a lease of property for the owner, who accordingly consummates a deal in the agent's absence, but at a less price, the owner may not take advantage of the agent's services and, after making the lease, repudiate his liability for the commissions to which the agent is entitled.

**3. Appeal and Error—New Trials—Substantial Error.**

A new trial will not be granted on appeal unless upon some substantial ground of error, or where it appears that the error could not have been harmful to the appellant.

CIVIL ACTION, tried before *Ray, J.,* and a jury, at October Term, 1919, of BUNCOMBE.

This action was brought by plaintiff to recover commissions on rent collected by defendant from the United States on the Haywood White Sulphur Springs property, located near Waynesville, and only involves commissions on the rent for eleven days in March, 1918, and for the month of April, 1918. No rent had been collected by defendant for the subsequent months at the time the summons was issued, but he had received rent for thirteen months at the time of the trial in the Superior Court of this case.

Plaintiff, a licensed real estate dealer in the city of Asheville, believing that the Government would rent defendant's property for hospital purposes, wrote a letter to defendant's son, with a request that it be delivered to his father, calling attention to the possibility, and requesting full information and data to be presented to the proper authorities.

The descriptive matter was sent by defendant to plaintiff the following day, with a letter stating that defendant would, at the time of the receipt of the rental, pay the plaintiff a commission of five per cent thereof, if the lease was made. When plaintiff received defendant's letter, he telephoned to defendant and requested him to come to Asheville on the next train, so he could go with plaintiff to Washington, and the latter would there offer the property to the War Department. Defendant came to Asheville, dined with plaintiff, and they left on the next train for Washington. Arriving there, plaintiff and defendant went to the office of Congressman Weaver, and plaintiff secured the assistance of him in obtaining an interview with Major Edgar King at the War Department, and the proposal for the leasing of the White Sulphur Springs property at $400 a month for hospital purposes or a sale at $60,000, was submitted to Major King, who said "he was glad to receive the proposal and would take it up." Plaintiff and defendant remained in Washington two or three days, during which time the former again saw Major King and was assured that "they would take it up and see what could be done and advise later." Plaintiff and defendant then returned to their homes, and plaintiff continued to correspond with Major King and Congressman Weaver in regard to the matter, but was unable to get a representative of the Government to examine the property. He also talked with Major Adams, of Asheville, on different occasions, and finally wrote to the Secretary of War and "told him that he was not getting fair treatment in regard to the Sulphur Springs property, as he couldn't get them to come and see the property," and that "if they would send a man to examine the Sulphur Springs property he knew it was what he had represented it to be." The next thing that occurred was, that Major Adams called plaintiff and told him that Major Bruns, who had been sent by General Gorgas to examine the Sulphur Springs property, was then in his office, and requested plaintiff to have defendant come to Asheville for a conference in Major Adams' office at 8 o'clock that night. Major Bruns requested Major Adams to get in communication with plaintiff, so that plaintiff could notify the defendant to be present at the meeting. Plaintiff then telephoned the defendant and told him of the conversation with Major Adams, but advised defendant not to come to Asheville, but to stay in Waynesville in order to force Major Bruns to go there, "so that he could see the property." Plaintiff said to defendant: "We have tried to get these people over to see the property, so it will be a good thing for you to stay where you are, and let them come out there," and suggested if defendant came to Asheville, Major Bruns would probably go back and never see the property. Plaintiff then telephoned Major Adams and told him that defendant would not come to Asheville, and that Major Bruns would have to go to Waynesville.

Major Bruns went to Waynesville the following morning and leased the property from defendant at $10,000 a year, with the understanding that defendant would make certain improvements to the property, the rent being increased to cover the cost of such improvements, and because the property was used for tubercular patients. On the day after Major Bruns went to Waynesville, plaintiff wrote to defendant, telling him that he allowed Major Bruns to go to Waynesville alone, saying, "I think he feels I rather forced him out there, but it was the only thing to do." Defendant replied the following day, stating that the trade had been made by himself, and he did not consider that plaintiff had anything to do with it.

While plaintiff and defendant were in Washington, plaintiff left with Major King full information and descriptive matter relating to the Sulphur Springs property. On 8 February, 1918, Mr. Raoul, proprietor of the Manor in Asheville, telephoned to defendant and suggested that defendant send a telegram to General Gorgas and offer the White Sulphur Springs property to the Government for a tuberculosis hospital, and defendant did so on the same day, and in his telegram said, "For further description, refer to Major Edgar King's files." Prior to that date defendant received a letter from Major King in regard to the tender by defendant of the Haywood White Sulphur Springs property for hospital purposes in which Major King stated: "It does not meet any present need of the Department." On 11 February, 1918, General Gorgas wired the defendant that an officer had been ordered to inspect the property. Plaintiff paid all of his expenses to Washington and return, and was never notified by defendant that he would not be paid for his efforts until the lease was practically consummated.

Defendant testified that the most he ever received for his property as rental prior to his lease to the Government was $2,500 a year; that he offered it to the Government for a "convalescent hospital" at $4,800 a year. Plaintiff testified that the offer was for "hospital purposes," without restrictions, and it is stated in a letter from Major King to defendant. Plaintiff leased it to the Government at $10,000 a year for a temporary tuberculosis hospital. The property was vacated by the Government in June, 1919, and it was conducted as a hotel during the summer season of 1919 by the same tenant and at the same rental as before the Government took charge. The defendant, when the property was returned to him, received with it a Red Cross building and other improvements put upon the property by the Government, in addition to repairs and improvements made by defendant, and for which the Government paid as part of the rent. Plaintiff was the only person who communicated with any representative of the Government in regard to leasing

defendant's property prior to the time Major Bruns was sent to Asheville, except that defendant sent a telegram to General Gorgas.

The following appears in the charge of the court:

"The defendant asked the court to give the following instructions, which was done:

"1. Unless the jury find from the testimony that the plaintiff was the real and procuring cause of leasing the property, they will answer the issue 'Nothing.'

"2. If the jury find from the testimony that the proposal of December 13 was refused by the Government, and that afterwards the defendant took up the matter and proposed to lease the property for a tuberculosis hospital, and that the lease was made through the defendant's efforts, and not as a result of plaintiff's efforts, as otherwise explained to you, then you will answer this issue 'Nothing.'

"3. If the jury find from the testimony that the proposal of December 15 was for a convalescent hospital, and that the same was declined by the Government, and that afterwards defendant proposed to lease the property for a tuberculosis hospital, and did so lease it, then they will answer the issue 'Nothing,' provided the plaintiff was not the procuring cause in the final trade."

The court further charged the jury: "It depends upon what position the plaintiff occupied in this last trade. If you find from the evidence that the original trade, in which it is admitted that the plaintiff was the defendant's broker and agent, failed to be consummated, and that it closed the matter, and that the plaintiff thereafter was not acting as the agent of the defendant, and a trade subsequently to this took place, then I charge you that if you find that to be the case, and the agency was terminated, then you will answer this issue 'Nothing.' But if you find, after the admission of the parties, that the plaintiff was the agent and broker of the defendant, and that he started the negotiations with the Government and the defendant, and that those negotiations were pending, and that he was the moving, or procuring, cause of the lease, and that the negotiations had not been broken off, and that he was still acting as the agent of the defendant, then you will answer that issue 'Yes,' and give such amount as you determine from this testimony the plaintiff is entitled to recover. So it is a question as to whether or not he was acting as the agent of the defendant, as to whether or not there were two definite contracts, in one of which the plaintiff was the agent of the defendant, and in the other of which he had nothing to do with it, and was not his agent, and the defendant acted on his own initiative."

The court then stated the contentions of the parties.

Verdict and judgment for plaintiff. Defendant appealed.

*Mark W. Brown for plaintiff.*
*Martin, Rollins & Wright for defendant.*

WALKER, J., after stating the case as above: The defendant was served with the summons in Buncombe County, and contends that this did not give the justice's court, where the action was originally commenced, any jurisdiction of his person, as he lived in Haywood County. There is nothing in this objection, as the statute only forbids a justice from issuing process in a civil action beyond his county. Rev., 1447; *Austin v. Lewis,* 156 N. C., 461.

The other question relates to the merits, and calls for a consideration of the evidence and the charge of the court upon the issues as to defendant's liability.

It is apparent the case involved largely the question of fact, whether the plaintiff, as broker of the defendant, brought the parties together for the purpose of making the contract of lease. There was evidence tending to show that the plaintiff started the negotiations between them, and was employed by the defendant to assist in him in the matter, because of his special skill in the business of selling and leasing property, he being a real estate broker, having his business office in the city of Asheville. There can be no question that the plaintiff would be entitled to his commissions if the lease had been effected at, or before, the time when the Government officer, Major King, wrote that the property "would not meet any present need of the Department." The defendant contends that he had no communication with plaintiff between 15 December, 1917, and 8 February, 1918, when defendant addressed a letter to Major General Gorgas, who was Surgeon-General of the Army and stationed at Washington, D. C., calling his attention to the Sulphur Springs Hotel at Waynesville, N. C., as a suitable building for tuberculosis patients, while plaintiff contended that he continued to act for the defendant up to the very time when the trade was closed with the Government for a lease of the property, upon the conditions specified in the above statement of the case. One of the principal controversies between the parties is, whether plaintiff was retained to lease the property as a hospital for convalescents only, at $4,800 per annum, or as a hospital generally, that is, for all kinds of patients, without restrictions to convalescents, the place finally being leased for tubercular patients, at $10,000 with certain stipulations as to improvements to be made by the defendant and a Red Cross building to be erected by the Government. Defendant's improvements cost him between $4,000 and $5,000; the Red Cross building cost $12,000, and he bought it for $1,100. Defendant, therefore, contends that this was an entirely new contract, proposed and initiated by him, in his letter of 8 February, 1918, to General Gorgas, and thereafter conducted by him, without aid from Campbell, to the end, while the plaintiff asserts

that it was but a part of one continuing transaction, and that it was his personal efforts bestowed on the matter to bring about the lease that really caused it to be made. That he brought Major Bruns, who represented the Government, to the meeting at Waynesville where the negotiations were concluded, and that it really and mainly was because of adopting his suggestions as to the meeting that the negotiations became successful. The jury could reasonably find from the evidence that plaintiff's services contributed largely to the fortunate result of the Waynesville conference.

There was evidence to sustain plaintiff's allegation that there was no restriction as to the kind of hospital intended by the parties, and the jury must have found that there was none.

All these questions were properly submitted to the jury, and they have found for the plaintiff. Now as to the law governing the relation of these parties. The learned judge tried the case according to the principle applied in *Trust Co. v. Goode,* 164 N. C., 19, which is thus stated: "When an owner places land with a real estate broker for sale, he agrees, in the absence of any special contract, to pay the customary commission or brokerage, in case a sale is consummated with a purchaser, who was led to begin the negotiation through the intervention of the broker. It is immaterial that the owner, after the broker has interested the purchaser, secretly pursues the negotiations and himself completes the sale, or that the owner of his own accord effects a sale at a less price than that he gave the broker. If any act of the broker in pursuance of his authority to find a purchaser is the initiatory step that leads to the sale consummated, the owner must pay the commission. The procuring cause of sale is such intervention of the broker for that purpose as constitutes the foundation on which the negotiation is begun. The law is clear that a broker does not forfeit his commission because the owner avails himself of the services rendered to sell at a price less than that limited, and the owner's position is not improved if he seeks to fortify his evasion of liability by telling the broker after the rendition of the services he will pay no commission, if he (the owner) sells at such price." And again: "Where a broker authorized to sell at private sale has commenced negotiations, the owner cannot, pending the negotiations, take it into his own hands and complete it, either at or below the price limited, and then refuse to pay the commissions," citing *Martin v. Holly,* 104 N. C., 36. According to this authority, the judge has strictly followed the correct precedents, for his language was identical, or at least substantially so, with that used in *Trust Co. v. Goode, supra.* The Court further said, and it also is pertinent to this case: "The decisions cited by the defendant (*Mallonee v. Young,* 119 N. C., 549; *Abbott v. Hunt,* 129 N. C., 403; *Trust Co. v. Adams,* 145 N. C., 161; *Clark v. Lumber Co.,* 158 N. C., 139) are based upon a different state of facts, and are

6—179

easily distinguished from this case as made out upon the plaintiff's evidence."

It is objected that the judge qualified the proposition, that the broker does not forfeit his commission because the owner, while availing himself of the broker's services, sells at a less sum than the specified price, referred to in *Goode's case* by this observation: "And the owner's position is not improved, if he seeks to fortify his evasion of liability by telling the broker after the rendition of the service, that he will pay no commission if he (the owner) sells at such a price." Here the defendant did not deny his liability to the broker for commissions until after the lease had been made, and it must be true that such a tardy repudiation of the agreement, which the jury found was made, will not affect the plaintiff's right to be compensated according to the contract. It came too late, and the defendant could not enjoy the benefit of the broker's services and refuse to pay for them. This is what the Court meant, when using the language taken from *Trust Co. v. Goode, supra.* As properly said in that case, *Trust Co. v. Adams, supra,* and the other cases cited with it above, are not in point. There we held that the services must result in a contract of sale, or lease, as the case may be, adding that, "Unsuccessful efforts, however meritorious, afford no ground of action. Where his acts bring about no agreement, or contract, between his employer and the purchaser, by reason of his failure in the premises, the loss of expended and unremunerated effort must be all his own. He loses the labor and skill used by him which he staked upon success. If there has been no contract, and the seller is not in default, then there can be no reward. His commissions are based upon the contract of sale," citing *Sibbald v. Iron Co.,* 83 N. Y., 378. But here plaintiff's contention was that he rendered continuous service, which did result in the contract, and the jury so found, under a singularly clear-cut statement of the issues between the parties, and the evidence applicable thereto. The use of the term "evasion of liability," when considered with proper reference to its setting in the charge, if prejudicial at all, is not sufficiently so to induce a reversal of the judgment. *S. v. Smith,* 164 N. C., 476; *Brewer v. Ring,* 177 N. C., 476; 3 Graham & Waterman on Trials, 1235. There must be some substantial ground upon which a new trial is asked before it will be granted, as said in those cases, and not something that could have worked no harm to the appellant.

If the plaintiff's evidence is true, and the jury has so found, his services had very much to do with the good result achieved in the final negotiations with the Government's officer. The other exceptions are groundless.

We are of the opinion that this case was correctly tried, and therefore affirm the judgment.

No error.