AMERICAN TRUST COMPANY v. W. S. GOODE ET AL.

(Filed 26 November, 1913.)

**Principal and Agent—Realty Broker—Sale by Owner—Commissions —Trials—Evidence—Nonsuit.**

While real property remains in the hands of a broker for the purpose of sale, the owner may not consummate the sale with one who had become interested as a proposed purchaser through the efforts of the broker, and escape liability to the latter for the payment of the commissions agreed upon; and where in an action by the broker to recover his commissions, there is conflicting evidence, but the evidence viewed in the light most favorable to the plaintiff's contentions tends to establish a transaction of this character, a judgment as of nonsuit upon the evidence should not be granted.

APPEAL by plaintiff from *Webb, J.,* at January Term, 1913, of MECKLENBURG.

Civil action, brought by a broker to recover his commissions for the sale of lands.

At the conclusion of the evidence the court rendered a judgment of nonsuit. Plaintiff excepted and appealed.

*J. W. Hutchison, Pharr & Bell for plaintiff.*
*Cansler & Cansler for defendants.*

BROWN, J.  The plaintiff sues to recover commissions upon
a sale of real estate alleged to have been made by it on behalf
of the defendants.  The plaintiff is a corporation doing business
in Charlotte, and has a department for the sale and purchase
of real estate, of which E. C. Griffith is manager.

The evidence must, in passing upon the motion to nonsuit, be
taken in the light most favorable to the plaintiff, and all rea-
sonable inferences must be drawn for the plaintiff's benefit.

The evidence tends to prove that the defendant owned cer-
tain property occupied by one Lummus as tenant; that defend-
ant requested Griffith to sell this property to Lummus; that
Griffith was trying to sell Lummus the Draper property.  When
Lummus refused to buy the Draper property, Lummus asked
for a price.

Griffith testifies: "I went to Mr. Goode and asked him for
the price, and he told me he wanted to submit the property on
the basis of $35,000, and not to fail to get a proposition to sub-
mit to him.  This was the day preceding the consummation of
the deal.  I then went to see Lummus again, and he was still
very much interested in the proposition, and asked me to come
back the next afternoon at 5 o'clock.

"Before the appointed hour came, Goode came into the office,
and said he was about to close the trade with Lummus for this
property, which was located at 203 South Church Street, and
wanted me to help him.  I had had a number of previous
transactions with Goode, having sold him the lot upon which
the building was subsequently located.

"In the first conversation, Goode stated that anywhere be-
tween $30,000 and $35,000 would be interesting to him, and
asked me to submit it at $35,000; said he wanted $35,000 for
it; that anywhere between $30,000 and $35,000 would buy the
property.  I tried to get this offer, and made an appointment
with Lummus for 5 o'clock the next afternoon.

"When Goode told me he had closed the deal, he came into
the office and said that he had incidentally seen Lummus, they

had started talking about the purchase of the property, and that he had gotten down to the point of a bargain—they wanted to trade.

"He said he wanted me to remain in the office until he and Lummus came there; wanted me to draw up the papers. In ten minutes he returned with Lummus; said they had decided to trade, but was depending upon a loan proposition, which I undertook to negotiate, and did."

The plaintiff's evidence tends further to prove that the defendant was thinking of buying the Draper property which the plaintiff had for sale, and that the agreement was that if he did so, he was to pay only a nominal commission for the sale of his own property.

About two weeks after the sale of his property, defendant came to see Griffith and told him he was unable to purchase the Draper property, and asked Griffith what the charges were for selling his property to Lummus.

There is no evidence in the record that defendant, after placing the property in the plaintiff's hands for sale, ever took it out.

On the contrary, the plaintiff's evidence tends to prove that in this case Griffith took up the matter of sale with Lummus at defendant's request, and was the efficient means by which the sale was made, and that he continued in the transaction, managed and conducted it, to a successful conclusion.

It is a fair inference, to be drawn from the defendant's conduct in going to Griffith after he decided not to buy the Draper property and inquiring how much he owed him for his services, that the defendant recognized his liability to pay a reasonable commission.

He had received the full benefit of Griffith's services in selling his property, negotiating the loan, and in preparing and executing the necessary papers. At that time the plaintiff evidently thought the laborer was worthy of his hire, and, therefore, he inquired the amount of his indebtedness.

It seems to be well settled that if the owner authorizes the broker to effect the sale of his property at a stipulated price,

he cannot make a sale direct to a person with whom he knows the broker to be negotiating, or who has been sent to him by the broker, at a less price, and thus defeat the broker's claim for compensation. 9 American and English Ann. Cases, page 435, note, and cases cited in notes.

In *Schelgal v. Allerton,* 32 Atl., 363, the owner of real estate, after his efforts to sell to W. had failed and had been abandoned, put it in the hands of a real estate agent to sell at a certain price. He then commenced negotiations with W., and while it still remained in his (agent's) hands, without notice to him the owner sold the property to W. for a less price than that at which the agent had been authorized to sell. The Court held the agent was entitled to his commissions on the amount for which the property sold.

In *Byrd v. Frost,* 29 S. W., 46, the Court held that where an owner of land places it in the hands of a broker to be sold for $4,000, and at the instance of the broker a proposed purchaser looks at the land, and afterwards buys it from the owner for $3,750, the latter is liable for the broker's commissions.

In *Williams v. Bishop,* 53 Pac., 239, the Court held that one who sells directly at a reduced price, property listed with a real estate broker to a purchaser the broker had found, and with whom he was negotiating a sale, without having introduced him to his principal, is liable for commissions on the price received.

*Hoadley v. Bank of Danbury,* 71 Conn., 599, 44 L. R. A., 321, is a case in point. Here property was placed in the plaintiff's hands for sale, and they told the plaintiff that X. might be a possible purchaser, and asked him to see X. and induce him to buy, stating that X. had some months before offered $38,000 for the property. Plaintiff saw him a number of times, and X. looked over the property. The defendants then sold to X. for $25,000. No agreement for any special rate of commission was made. The court found that plaintiff was the procuring cause of the sale, and entitled to recover. The Court said: "When an owner places land with a real estate broker for sale, he agrees, in the absence of any special contract, to pay the customary commission or brokerage, in case a sale is consummated with a

purchaser, who was led to begin the negotiation through the intervention of the broker. It is immaterial that the owner, after the broker has interested the purchaser, secretly pursues the negotiations and himself completes the sale, 'or that the owner of his own accord effects a sale at a less price than that he gave the broker.

· "If any act of the broker in pursuance of his authority to find a purchaser is the initiatory step that leads to the sale consummated, the owner must pay the commission. The procuring cause of sale is such intervention of the broker for that purpose as constitutes the foundation on which the negotiation is begun.

"The law is clear that a broker does not forfeit his commission because the owner avails himself of the services rendered to sell at a price less than that limited, and the owner's position is not improved if he seeks to fortify his evasion of liability by telling the broker after the rendition of the services he will pay no commission, if he (the owner) sells at such price."

Our own Court has said: "Where a broker authorized to sell at private sale has commenced negotiations, the owner cannot, pending the negotiations, take it into his own hands and complete it, either at or below the price limited, and then refuse to pay the commissions." *Martin v. Holly,* 104 N. C., 36.

· In the case at bar, if Griffith's evidence is to be believed, the sale was made within the limits fixed by the defendant when he placed his property in Griffith's hands for sale, that is, between $30,000 and $35,000.

Upon Griffith's version of the facts, the plaintiff is entitled to recover reasonable commissions. The decisions cited by the defendant (*Mallonee v. Young,* 119 N. C., 549; *Abbott v. Hunt,* 129 N. C., 403; *Trust Co. v. Adams,* 145 N. C., 161; *Clark v. Lumber Co.,* 158 N. C., 139), are based upon a different state of facts, and are easily distinguishable from this case as made out upon the plaintiff's evidence. ·

The judgment of the Superior Court nonsuiting the plaintiff is

Reversed.