S & W REALTY & BONDED COMMERCIAL AGENCY, INC., v. DUCK-
WORTH & SHELTON, INC.

No. 276

(Filed 23 August 1968)

**1. Brokers and Factors § 6— right to commissions**

Ordinarily, a broker with whom an owner's property is listed for sale becomes entitled to his commission whenever he procures a party who actually contracts for the purchase of the property at a price acceptable to the owner.

**2. Brokers and Factors § 6— right to commissions — procuring cause of a sale**

The broker is the procuring cause of a sale if the sale is the direct and proximate result of his efforts or services.

**3. Brokers and Factors § 6— "procuring cause" defined**

The term "procuring cause" refers to a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms.

**4. Brokers and Factors § 6— determination of broker's commission**

The owner is not permitted to reap the benefits of the broker's labor without just reward if he has requested a broker to undertake the sale

of his property and accepts the results of services rendered at his request; the owner is liable for the reasonable value of those services, or the listing agreement can make the payment of commissions dependent upon the broker's obtaining a certain price for the property.

5. **Brokers and Factors § 6— right to commission — where broker does not find prospect**

The rule that the broker is entitled to compensation where the owner of the listed property reduces the price and sells it to the broker's prospect does not apply when the broker did not find the prospect to whom the owner sold the property.

6. **Corporations § 4; Evidence § 31— corporate minutes — best evidence — oral testimony**

The minutes of a corporation, which are required by G.S. 55-37, are the best evidence of its acts; when it is shown that no minutes were made of a particular meeting, or that they are incomplete, the proceedings may be proved by parol testimony.

7. **Corporations § 12— right of officer to compensation**

An officer of a corporation has no right to compensation for services rendered the corporation in the absence of an express contract to pay for them.

8. **Brokers and Factors § 6— broker's oral contract of employment with corporate defendant — sufficiency of evidence**

In an action by plaintiff realty corporation to recover a commission of 5% of the purchase price of realty allegedly sold by the plaintiff on behalf of the defendant owner of the realty, testimony by the officers and stockholders of the plaintiff, who were also officers and minority stockholders of the defendant corporation, that there was an oral contract of employment between plaintiff and defendant to sell the realty at a price of $100,000, which testimony was not objected to, *is held* sufficient to constitute a *prima facie* showing of a contract between the parties, and defendant corporation's motion for nonsuit was properly denied.

9. **Trial § 33— instructions — application of law to evidence**

Instructions which fail to apply the law to the evidence are error. G.S. 1-180.

10. **Brokers and Factors § 2— termination of employment**

When no time is specified in his contract, if a broker fails to find a purchaser or to make the sale within a reasonable time, his contract of employment is at an end.

11. **Corporations § 12— contract between officer and adversely interested director — validation**

A contract between a corporation and a director having an adverse interest may be validated if, after a full disclosure, the transaction is specifically approved by a majority of the voting shares other than those owned or contracted by the adversely interested directors. G.S. 50-30(b), (1) and (2).

REALTY AGENCY, INC. v. DUCKWORTH & SHELTON, INC.

12. **Brokers and Factors § 6— action for commissions — failure to submit to jury issues arising on the evidence**

In an action by plaintiff realty corporation to recover a commission allegedly arising from the sale by plaintiff of property owned by the defendant corporation, there was sufficient evidence to require the submission of the following issues to the jury, and the failure to do so was error: (1) that the original contract of employment between the parties to sell the property for $116,500 had terminated prior to the sale of the property for $100,000 and that the contract had no bearing upon the rights of plaintiff's recovery; (2) that the plaintiff, in order to recover at all, must satisfy the jury by the greater weight of the evidence that the directors of defendant-corporation expressly employed the plaintiff to negotiate a sale of the property for $100,000 and that the directors validated the contract pursuant to G.S. 50-30(b), (1) and (2); and (3) that, pursuant to the contract, the plaintiff did procure the sale of the property.

13. **Brokers and Factors § 6— instructions on broker's amount of damages — reasonable value of services**

In an action by a realty corporation to recover a commission allegedly earned by the sale of defendant's property, instructions on the amount of compensation to which plaintiff was entitled to recover are erroneous where (1) the trial court referred to a terminated contract of employment as the basis of defendant's liability to plaintiff, the evidence showing instead that the sale was made pursuant to a subsequent oral contract of employment in which no rate of commission was stated, and where (2) the court failed to charge the jury that it was not bound to fix the compensation at a rate of 5% of the sale, which rate was testified to by the plaintiff as the standard commission in the area on the sale of commercial property, but that the plaintiff was entitled to recover, if at all, only the reasonable value of the services it rendered, based upon the skill, time, effort and cost expended in procuring the sale.

APPEAL by defendant from *Hasty, J.,* 18 September 1967 Schedule "A" Session of MECKLENBURG.

Action to recover a brokerage fee.

Plaintiff alleges: The name of plaintiff corporation has been changed to S & W Realty and Insurance Agency. Defendant corporation listed with plaintiff for sale certain properties which defendant "owned in the City of Charlotte located on and adjacent to West Trade Street and agreed to pay a commission of 5% of the purchase price of said property in the event an acceptable offer was obtained on said property." On 8 July 1965, plaintiff sold the property to the Belk Investment Company for $100,000.00. It is, therefore, entitled to recover $5,000.00, which defendant refuses to pay. Answering, defendant denied that it made the alleged contract and that plaintiff made the sale to Belk's Investment Company. It further averred that plaintiff is a corporation solely owned and operated by R. C. Shelton, Sr., and R. C. Shelton, Jr., who are also

officers and directors of defendant Corporation; that, because of the fiduciary relationship existing between the officers and directors of the two corporations, defendant could not make a contract to pay plaintiff a commsision unless its directors and stockholders gave their express consent, and that no such consent was given.

Both plaintiff and defendant offered evidence. That of plaintiff tended to show:

For the sale of commercial property in Charlotte during 1965, the usual compensation of brokers and real estate agents was 5%. At all times pertinent to this litigation, Shelton, Jr., owned 48% of the stock in defendant corporation; Shelton, Sr., owned 1%; and Fred L. Taylor, 51%. Shelton, Sr., was president of plaintiff corporation, a stockholder, and a member of its board of directors. Since March 1966, Shelton, Jr., has been with plaintiff. He is secretary-treasurer, a stockholder, and a member of the board of directors of plaintiff-corporation.

The minutes of the annual meeting of defendant's stockholders and directors on 23 November 1962 show: (1) The three stockholders were present. (2) The following directors and officers were elected: F. L. Taylor, president; R. C. Shelton, Jr., vice-president; R. C. Shelton, Sr., secretary-treasurer; and David Whitesell, assistant secretary. (The evidence contains no further mention of Whitesell, who was not a stockholder.) (3) "After general discussion, motion was duly made, seconded and adopted that: S & W Realty Company be authorized to offer Belk the 217-219 Trade and Arcade properties for $139,500.00 and would consider an offer of a minimum of $116,500.00. That S & W Realty Company be paid a commission of 5% of sales price. Further that; (sic) the Pegram Street properties could be sold for a minimum of $10,000.00 net after commission of 5% to S & W Realty Company."

The Trade and Arcade properties referred to in the preceding minutes (Trade Street property) were adjacent to land owned by Belk Brothers Department Store in Charlotte (Belk's). Shelton, Sr., offered it to Belk's for $116,500.00. The offer was not accepted although LeRoy Robinson, one of Belk's agents with whom he dealt, told Shelton, Sr., that the store wanted the property. During 1963, 1964, and 1965, the continuous efforts of Shelton, Sr., to sell the property to Belk's for $116,500.00 were unsuccessful. Shelton, Jr., took no part in these negotiations. During 1965 defendant's stockholders and directors decided to offer the Trade Street property to Belk's for $100,000.00. No minutes recording this decision were produced. According to Shelton, Sr., however, "There was bound to have

been a meeting to authorize this sale," but he could not "recall the exact place." At that meeting, however, nothing was said about a 5% commission, but Shelton said, "If I'm exclusive agent for a piece of property I don't have to go back and reiterate I am due 5 per cent commission." He did know that "the meeting was called to confirm the sale which S & W Realty had made to Joe Robinson for Belk Industries." He himself employed Mr. Ervin (Paul R. Ervin, attorney) to represent him in the sale of the property to Belk's, and he authorized Ervin to make the proposition on behalf of S & W Realty Company. Defendant's directors did not authorize him to make it on behalf of defendant. "S & W Realty was exclusive agent at that time as there had never been anything changed from the meeting in 1962. . . . We decided when we met that the proposition would be made, we authorized Mr. Ervin to make it."

Shelton, Jr., testified: "My father, as representative of S & W, was authorized to offer it to them (Belk's) for $100,000.00. Mr. Ervin . . . was asked by the Board of Directors of the defendant to accompany my father. So, yes, he did represent the defendant. . . . Nothing was said at this 1965 meeting of the board of directors and stockholders of Duckworth & Shelton concerning a 5 per cent commsision."

Prior to the time Shelton, Sr., and Mr. Ervin made the $100,000.00 proposition to Mr. Robinson, there had been no deal with Belk's. On 21 April 1965, Mr. Ervin conferred with Mr. Joe H. Robinson and, through him, submitted the $100,000.00 proposition to Belk's. On that same day he wrote Taylor's attorney, Mr. Louis A. Bledsoe, Jr., that he believed Belk's would accept the offer; that defendant "would be obligated to Mr. R. C. Shelton, Sr., for a 5% commission on a sale of the property"; and that "the tax implications" of the sale suggested a dissolution of defendant corporation. The letter also referred to Taylor's offer to sell his stock in defendant for $40,000.00.

On 3 May 1965, Mr. Ervin wrote Mr. Joe H. Robinson that his firm represented Duckworth and Shelton, Inc., and had been authorized by its client to offer its Trade Street property to Belk's "for a period of thirty days," for a total price of $100,000.00. On 18 May 1965, Mr. Robinson wrote Ervin that Belk's accepted "the offer of Duckworth & Shelton, Inc., to sell this property for a total of $100,000.00." On 3 June 1965, Ervin wrote Bledsoe asking him to have Taylor sign the deed to Belk's so that the sale could be closed. "We can then," he wrote, "litigate about the matters which are in dispute."

On 2 July 1965, the Sheltons and Taylor, with their respective

attorneys, Ervin and Bledsoe, Jr., held a special meeting of the directors of defendant corporation and adopted a resolution introduced by Shelton, Jr., which (1) authorized the complete liquidation and dissolution of the corporation and (2) approved and ratified "the actions of the officers of the corporation in negotiating for the sale of the real property which the corporation owns which is located on or near East Trade Street, Charlotte, N. C., to Belk Investment Company . . . for the sum of $100,000.00. . . ."

The final meeting of the stockholders and directors of the defendant corporation was held on 1 July 1966. The minutes show that deeds for their pro rata interest in the Pegram property, which had not been sold, had been delivered to the stockholders; that after paying the debts of defendant, the balance of the $100,000.00 received from the sale of the Trade Street property — less the sum of $10,195.45 — had been distributed to the stockholders. Pending the adjudication of plaintiff's claim for the $5,000.00 commission in suit and the claim of Shelton, Sr., for $4,633.25 "for commissions from the collection of rents and handling of the corporation's property," the sum of $10,195.45 is being held by Ervin and Bledsoe in a trust account in their joint names.

Witnesses for defendant were Joe H. Robinson, vice-president of Belk's, and Fred L. Taylor, the majority stockholder in defendant corporation.

Mr. Robinson testified: When he "came with Belk's" in the fall of 1964, he was informed that Belk's wished to acquire defendant's Trade Street property. In consequence, he contacted Shelton, Sr., and told him that Belk's would pay $100,000.00 for it and that it would not pay a real estate commission on the sale. Shelton, Sr., said "that he wanted more for his property," but Robinson told him that $100,000.00 was Belk's limit. Shelton, Sr., said he would consider the offer and confer later. Hearing nothing further from him, Robinson telephoned Taylor and told him that Belk's would still pay $100,000.00 for the property; that it would buy the stock of defendant corporation or handle the transaction in any way the owners of the property preferred. Taylor told him that "he would personally inject himself into the matter" and that he would sell his interest in the property "regardless." The next event was a phone call from Ervin, who inquired if Belk's was willing to pay $100,000.00 for the property. Robinson said YES, and thereafter the sale was concluded. Since he was familiar with the ownership of defendant corporation, Robinson did not ask Mr. Ervin whom he represented.

Mr. Taylor testified: At the 23 November 1962 meeting of de-

fendant's directors, Shelton, Sr., said that he felt that he could sell the property to Belk's for $139,500.00 "in a few months." Within six months, however, he reported to Taylor that he was not getting anywhere and asked his help. Taylor contacted Belk's Mr. Gibson Smith and, in the discussion, told him that he could acquire the property by acquiring stock in defendant corporation. Although Taylor saw Shelton, Sr., every thirty days from early 1964 until 11 January 1965, he made no further report to Taylor of any negotiations with Belk's.

On or about 13 February 1965, in a meeting held in Mr. Ervin's office, Taylor and the two Sheltons authorized Ervin, on behalf of defendant, to negotiate the sale of the Trade Street property with Belk's for $100,000.00. No such authority was given to plaintiff. Ervin was the only one directed to negotiate the sale, and no commission on the sale was authorized for anyone. On 15 February 1965, Mr. Bledsoe, as attorney for Taylor, wrote to Mr. Ervin giving him authority for thirty days to negotiate with Belk's the sale of the East Trade Street property "in order to give Mr. Fred L. Taylor the proposed sale price of $40,000.00 for his stock in Duckworth & Shelton, Inc."

The next information which Taylor received about the sale was contained in a copy of a letter of 21 April 1965 which Ervin wrote to Bledsoe. Another conference was then held in Mr. Ervin's office. They "discussed that matter pro and con. The subject of the commission to be paid to Mr. R. C. Shelton, Sr., or S & W Realty was not discussed at that meeting. Mr. Shelton got up and left the meeting. The subject of a commission was mentioned to (Taylor), in the letter referred to as plaintiff's Exhibit 2 (letter of 21 April 1965 from Ervin to Bledsoe), and (Taylor) told Mr. Ervin that (he) would not go along with the payment of a commission and that (he) would go along with the sale (only) if it were $100,000.00 net to the corporation."

There was never a meeting of the board of directors or the stockholders of defendant corporation in which it was agreed that plaintiff would receive a commission for selling the Trade Street property to Belk's for $100,000.00; nor was any representative of plaintiff ever authorized to offer the property to Belk's for $100,000.00. Mr. Ervin was directed to present the offer.

On 14 July 1965, Taylor, as president of defendant, received a letter from Ervin threatening suit if the corporation did not immediately pay plaintiff $5,000.00 for its services "in handling" the sale to Belk's. At Taylor's instance, Bledsoe wrote Mr. Ervin that the

stockholders and directors of defendant sold the property to Belk's through him and that defendant would not pay plaintiff a commission on the sale.

Defendant's motions for nonsuit were overruled. Issues were submitted to the jury and answered as follows:

"1. Did the plaintiff and defendant enter into a contract whereby the plaintiff was to sell real property belonging to the defendant, as alleged in the complaint? ANSWER: Yes.

"2. If so, did the plaintiff procure a purchaser able, willing, and ready to perform at the minimum price of $116,500? ANSWER: No.

"3. Was the plaintiff the procuring cause of the sale of the property? ANSWER: Yes.

"4. What amount, if any, is plaintiff entitled to recover of the defendant? ANSWER: $5,000.00."

From the judgment entered upon the verdict, defendant appeals, assigning as error, *inter alia*, the failure of the court to grant its motion of nonsuit and certain portions of its charge to the jury.

*Ervin, Horack & McCartha by Paul R. Ervin and William E. Underwood, Jr., for plaintiff appellee.*

*Berry and Bledsoe by Louis A. Bledsoe, Jr., and C. Ralph Kinsey, Jr., for defendant appellant.*

SHARP, J.

In this case, plaintiff alleges one brokerage contract; defendant's minutes, upon which plaintiff relies, show another; plaintiff's evidence shows a third. Understandingly, the issues do not bring the case into sharp focus.

These facts are conceded by both parties: On 23 November 1962, defendant agreed that it would pay plaintiff a 5% commission if plaintiff sold defendant's Trade Street property to Belk's for $116,-500.00 or more. Plaintiff was never able to effect a sale upon those terms. Approximately two and one-half years later defendant sold the property to Belk's for $100,000.00 in negotiations conducted by an attorney, Mr. Paul Ervin. The case was submitted to the jury to determine whether plaintiff was the procuring cause of the sale and, if so, what was the reasonable value of its services.

[1-3] Ordinarily, a broker with whom an owner's property is listed for sale becomes entitled to his commission whenever he procures a party who actually contracts for the purchase of the property at a

price acceptable to the owner. *Cromartie v. Colby*, 250 N.C. 224, 108 S.E. 2d 228; *Martin v. Holly*, 104 N.C. 36, 10 S.E. 83. If any act of the broker in pursuance of his authority to find a purchaser is the initiating act which is the procuring cause of a sale ultimately made by the owner, the owner must pay the commsision provided the case is not taken out of the rule by the contract of employment. *Trust Co. v. Goode*, 164 N.C. 19, 80 S.E. 62. The broker is the procuring cause if the sale is the direct and proximate result of his efforts or services. The term *procuring cause* refers to "a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms." 12 C.J.S. *Brokers* § 91, p. 209 (1938). *Accord,* 12 Am. Jur. 2d *Brokers* § 190 (1964).

[4] The law does not permit an owner "to reap the benefits of the broker's labor without just reward" if he has requested a broker to undertake the sale of his property and accepts the results of services rendered at his request. In such case, in the absence of a stipulation as to compensation, he is liable for the reasonable value of those services. *Thompson v. Foster*, 240 N.C. 315, 82 S.E. 2d 109; *Thomas v. Realty Co.*, 195 N.C. 591, 143 S.E. 144; *Reams v. Wilson*, 147 N.C. 304, 60 S.E. 1124. Of course, the listing agreement can make the payment of commissions dependent upon the broker's obtaining a certain price for the property. See Annot., 46 A.L.R. 2d 848, 859 (1956); *Thompson v. Foster, supra.*

[5] The foregoing decisions, however, do not fit the facts of this case. This is not a situation in which an owner, who has listed real estate with the broker at a specified price, reduces the price and sells it to the broker's prospect. When that occurs, clearly the broker is entitled to compensation. *Cromartie v. Colby, supra; Thompson v. Foster, supra; Lindsey v. Speight*, 224 N.C. 453, 31 S.E. 2d 371; *Trust Co. v. Goode, supra; Martin v. Holly, supra.* Here, plaintiff-broker did not find the prospect to which defendant-owner sold the property nor did it initiate Belk's interest in the property. As every individual involved in the affairs of plaintiff and defendant well knew, Belk's wanted the land because it adjoined its property. Mr. Robinson, one of Belk's vice-presidents, testified that in 1964 he had told both Shelton, Sr., and Taylor that Belk's wanted the property; that it would pay $100,000.00 for it but no more. Belk's was defendant's prime prospect and — so far as this evidence reveals —

its only one. In making the sale, the directors' sole problem was how to exploit the strategic location of defendant's property and to get Belk's top dollar for it as soon as possible.

Defendant's assignment of error that the judge erred in failing to grant its motion of nonsuit raises the question whether the evidence will support a finding that defendant employed plaintiff to negotiate the sale of its property to Belk's for $100,000.00 and that plaintiff procured the sale.

[6] To establish its contract of employment to sell the property to Belk's for $100,000.00, plaintiff does not rely upon corporate minutes but upon the oral testimony of its two stockholders. A corporation is required to keep minutes of the proceedings of its shareholders and board of directors. G.S. 55-37. They are the best evidence of its acts. *Pegram-West v. Insurance Company*, 231 N.C. 277, 56 S.E. 2d 607; *Respess v. Spinning Co.*, 191 N.C. 809, 133 S.E. 391. However, when it is shown that no minutes were made of a particular meeting, or that they are incomplete, the proceedings may be proved by parol testimony. *Tuttle v. Building Corp.*, 228 N.C. 507, 46 S.E. 2d 313; Robinson, North Carolina Corporate Law and Procedure § 49 (1964).

The absence of the minutes authorizing the offer of the property to Belk's for $100,000.00 is not explained in the evidence. Notwithstanding the foregoing rule, Shelton, Jr., testified without objection that, at a meeting of the board of directors, Shelton, Sr., "as representative of S & W was authorized to offer it (the land) to them (Belk's) for $100,000.00; that defendant's directors asked Ervin to accompany Shelton, Sr., to Belk's "in his capacity." Also without objection, Shelton, Sr., testified that defendant's board of directors had directed Ervin to make the offer to Belk's through S & W Realty Company; that he himself employed Ervin to help him consummate the sale; and that it was he who directed him to make the offer to Belk's through plaintiff corporation, which "was exclusive agent at that time as there had never been anything changed from the meeting in 1962." He added, "We were continually discussing the property with Belk's up until the property was sold."

The only minutes in evidence which relate to the sale of the Trade Street property contain the resolution of 23 November 1962 and the resolution of 2 July 1965, which approved the action of defendant's officers "in negotiating for the sale" of the Trade Street property to Belk's "for the sum of $100,000.00 as a part of the plan of liquidation and dissolution of the corporation."

[7] An officer of a corporation has no right to compensation for

services rendered the corporation in the absence of an express contract to pay for them. *Credit Corporation v. Boushall,* 193 N.C. 605, 137 S.E. 721; *Caho v. R. R.,* 147 N.C. 20, 60 S.E. 640. Certainly, plaintiff-corporation was not an officer of defendant corporation, but Shelton, Jr., and Shelton, Sr., two of the three directors and stockholders of defendant-corporation, were also the sole directors and stockholders of plaintiff-corporation. Thus, in the transaction in suit, all plaintiff's stockholders (two realtors now composing a corporation, G.S. 55-3-1) have an interest adverse to defendant-corporation. No corporate veil can conceal this interest. If the Sheltons, through plaintiff-corporation, obtain a realtor's commission upon the sale of the property, which they owned as stockholders in defendant-corporation, they will profit over and above their distributive share in the distribution of defendant's assets. Their gain will be at the expense of Taylor, a director and the majority stockholder, who testified that defendant never employed plaintiff to negotiate a sale with Belk's for $100,000.00.

The brokerage services which plaintiff-corporation alleges it rendered defendant-corporation were within the scope of the duties of the directors and officers of defendant-corporation, which was patently formed for the purpose of buying and selling real estate. Its only assets upon dissolution were the net proceeds of the sale to Belk's and a lot valued at $15,000.00. The reason for the rule which prohibits an officer of a corporation from maintaining an action against it for services rendered within the scope of his duties as such officer absent an express contract to pay for those services is equally applicable to the dealings between these two closely held corporations. Before plaintiff-corporation can recover commissions in this case it must prove an express contract of employment whereby defendant employed it to sell the Trade Street property to Belk's for $100,000.00. The testimony of Shelton, Jr., and Shelton, Sr., although largely a statement of their conclusions that plaintiff and defendant had entered into a contract, went in without objection; it constitutes a *prima facie* showing of a contract of employment between plaintiff and defendant.

[8] We hold that plaintiff's evidence was sufficient to withstand defendant's motions for nonsuit.

We next consider defendant's assignments of error to the charge. After having instructed the jury as to the burden of proof, the court gave the following instruction as to the third issue: "The procuring cause, members of the jury, is the approximate cause, the cause originating a series of events which without breaking their conti-

nuity result in the accomplishment of the prime object. . . . (contentions omitted) . . . Now, members of the jury, if the plaintiff has satisfied you by the greater weight of the evidence that the effort, if any, which it put forth or expended in offering or trying to sell the property to Belk was the procuring cause, as I have defined procuring cause to you, of the sale of the property to Belk Investment Company, it would be your duty to answer this third issue 'yes.' If you fail to so find, it would be your duty to answer the third issue 'no.' "

[9]   The foregoing instructions, which defendant assigns as error, were inadequate. *Inter alia,* they failed to comply with G.S. 1-180 in that the court made no attempt to apply the law to defendant's evidence.

In effect, we have here the anomalous situation in which two stockholders and directors of defendant are suing defendant upon an oral contract which must be established by their testimony, which is unsupported by any minutes, and which is denied by the majority stockholder. Defendant contends that its three directors knew that they could sell the property to Belk's at any time they were willing to take $100,000.00 for it; that under these circumstances, the contract which plaintiff declares was not just and reasonable to the corporation; that Taylor would never have consented to pay a realtor to make a sale which was, in effect, already made; that the corporation could not have made such a contract without Taylor's consent — which was not given; and that defendant-corporation authorized Ervin to act for it in effecting the sale. Whom Ervin represented is one of the disputed facts in the case. Plaintiff contends that he represented it exclusively. Defendant contends that he represented the Sheltons individually as stockholders and directors (in this case, inseparable statuses) and that, in acting for them in that capacity, he acted for defendant-corporation under authority of the directors.

[10]   In April 1965, the contract which defendant had made with plaintiff on 23 November 1962 was at an end. It was then obvious to the directors that plaintiff would be unable to sell the property to Belk's for $116,500.00. When no time is specified in his contract, if a broker fails to find a purchaser or to make the sale within a reasonable time, his contract of employment is at an end. 12 C.J.S. *Brokers* §§ 66(c), 88 (1938); 12 Am. Jur. 2d *Brokers* § 57 (1964). See *Parkey v. Lawrence,* 284 S.W. 283 (Tex. Civ. App.)

[11]   No legal bar prevented defendant from employing Shelton, Sr., — individually or through his corporation — to sell its property

to Belk's and to pay the reasonable value of its services. A new and express contract of employment, however, was required. Furthermore, the provisions of G.S. 55-30 were applicable to the contract. Presumably, however, in this case, if the jury finds in accordance with the Sheltons' testimony that the directors of defendant employed plaintiff-corporation to effect a sale to Belk's for $100,000.00, such a finding would bring the contract within the provisions of G.S. 50-30(b), (1) and (2). These sections validate a contract between a corporation and a director having an adverse interest if, after a full disclosure, the transaction is specifically approved by a majority of the voting shares other than those owned or contracted by the adversely interested directors. Taking plaintiff's evidence as true, and giving plaintiff the benefit of every inference of fact which may reasonably be drawn from the evidence — as we are required to do in passing upon a motion for nonsuit —, Taylor was one of the directors who "authorized" plaintiff to sell the property to Belk's for $100,000.00. The transcript does not reveal the manner in which the directors are authorized to do business. G.S. 55-28(d).

[12]    The judge should have instructed the jury (1) that the contract of 23 November 1962 had terminated in April 1965, that plaintiff could base no recovery upon it, and that it had no bearing upon the value of the services for which plaintiff sues; (2) that in order to recover, plaintiff must satisfy the jury by the greater weight of the evidence (a) that the directors of defendant-corporation made an express contract with plaintiff whereby it employed plaintiff to negotiate a sale of its Trade Street property to Belk's for $100,000.00, (b) that the contract came within the provisions of G.S. 50-30(b), (1) and (2), or (3); and (c) that, pursuant to the contract, plaintiff did procure the sale to Belk's.

[13]    On the issue of damages, the court instructed the jury as follows: "Even though the plaintiff failed to obtain a purchaser willing, able and ready to take the property at the price stipulated, $116,500.00, in the contract between the plaintiff and defendant, plaintiff may still recover the reasonable value of his services, if such services were the procuring cause of the sale of the property."

Defendant's exception to the foregoing portion of the charge must likewise be sustained. It erroneously referred to the contract of 23 November 1962 as the basis of defendant's liability to plaintiff, and it inadequately dealt with the question of damages. Testimony that commissions for the sale of commercial property in Charlotte were 5% of the sales price was offered and admitted as evidence bearing upon what sum was ordinarily considered reasonable compensation

for plaintiff's services as a broker. Even though the jury found plaintiff to be entitled to compensation for its services with reference to the sale to Belk's, it was not bound to fix plaintiff's compensation at this rate, and the court should have so instructed the jury. *Thomas v. Realty Co., supra.*

As heretofore pointed out, plaintiff did not procure Belk's as a prospect nor did it interest Belk's in the property. Defendant contends that plaintiff's evidence showed that little work was required to make the sale to Belk's once defendant's director-stockholders had decided to accept its offer to pay $100,000.00 for the property; that the sale was effected when, by a telephone call, Mr. Ervin gave Mr. Robinson this information; that if Shelton, Sr., did anything at all, he merely accompanied Mr. Ervin on a visit to Robinson; that if plaintiff paid Ervin for these services there is no evidence what the fee was.

If plaintiff is entitled to recover compensation in connection with the sale, it is entitled to recover only the reasonable value of the services it rendered after defendant reduced the price of the land to $100,000.00. In fixing this amount, the jury may properly consider the skill required and the time, effort, and cost expended in procuring the sale.

For the errors indicated, there must be a new trial. Prior thereto, plaintiff would be well advised to seek permission to recast its pleadings to conform to its evidence.

New trial.