Gunn v. Lab. Corp. of Am., 2014 NCBC 29.

STATE OF NORTH CAROLINA

COUNTY OF ALAMANCE

RICHARD W. GUNN, JR. and
GUNN & ASSOCIATES, LLC,

        Plaintiffs,

        v.

LABORATORY CORPORATION OF
AMERICA,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 1599

)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER AND OPINION**

{1}     THIS MATTER is before the court on Defendant Laboratory Corporation of America's Motion for Summary Judgment ("Motion") made pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons explained below, the Motion is GRANTED in part.

*Vernon, Vernon, Wooten, Brown, Andrews & Garrett, PA by E. Lawson Brown, Jr. for Plaintiffs.*

*Parker, Poe, Adams & Bernstein LLP by William L. Rikard, Jr. and Matthew H. Mall for Defendants.*

Gale, Judge.

## I.    PROCEDURAL BACKGROUND

{2}     Plaintiffs Richard W. Gunn, Jr. ("Gunn") and Gunn & Associates, LLC ("Gunn & Associates") initiated this action by filing a complaint on August 6, 2013. This action arises out of an alleged brokerage relationship between Defendant Laboratory Corporation of America ("LabCorp") relating to a commercial lease LabCorp entered at a property known as the Salem Building. Plaintiffs allege claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, procuring cause, *quantum meruit*, and unfair or deceptive trade practices in violation of Section 75-1.1 of the North Carolina General Statutes.

{3}    Plaintiffs previously alleged identical claims against LabCorp based on the same transactions and occurrences giving rise to this lawsuit. *See generally Gunn v. Simpson, Schulman & Beard, LLC*, 2011 NCBC LEXIS 35 (N.C. Super. Ct. Sept. 23, 2011).[1] Plaintiffs voluntarily dismissed that action after discovery closed, but before the deadline for filing post-discovery dispositive motions. LabCorp now contends that testimony from the prior action prevents Plaintiffs from prevailing on their claims in this case. Plaintiffs contend that further discovery would demonstrate a basis on which they could recover. The court then entered a Case Management Order allowing LabCorp to file an early summary judgment motion addressing why, regardless of any new evidence Plaintiffs might now seek to develop, the prior testimony bars Plaintiffs claims. The Order also afforded Plaintiffs the opportunity to tender any evidence they believed additional discovery would develop, which the court would treat as if it were record evidence competent to be considered in opposition to the summary judgment motion, effectively precluding summary judgment under Rule 56(f). Discovery has been stayed pending the court's ruling on LabCorp's Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND

{4}    The court does not make findings of fact when ruling on a motion for summary judgment. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). It is, however, appropriate for the court to describe the undisputed facts or lack of facts the record discloses in order to provide context for the court's ruling on the motion. Based on the record, and after drawing

---

[1] In the earlier action, Plaintiffs also sued SN Commercial, LLC, which served as the landlord's broker in the lease transaction and received a brokerage fee that it split with Simpson, Schulman & Beard, LLC, LabCorp's representative. The court dismissed the claim against SN Commercial, LLC by its Order dated September 23, 2011. Plaintiffs then proceeded against LabCorp until voluntarily dismissing the action.

factual inferences in Plaintiffs' favor, the court believes the following facts are established and control the court's ruling on the Motion.

    A.  <u>Gunn's Brokerage Relationship with LabCorp</u>

{5}    There was no written agreement between Gunn or Gunn & Associates and LabCorp concerning Gunn's brokerage services for the specific project at issue. (Gunn Dep. 25:3–13, Dec. 13, 2011.) Gunn contends, however, that an enforceable contract can be implied from a twenty-five (25) year course of dealing with LabCorp and his communications on this project with Gary Aherron ("Aherron"), a LabCorp employee. (Gunn Dep. 24:10–26:23.)

{6}    Gunn estimates that during this twenty-five (25) year course of dealing he has helped LabCorp purchase, lease, or sell between twenty-five (25) and thirty (30) properties. (Gunn Dep. 29:1–31:4.) During this course of dealing, Gunn and Gunn & Associates regularly provided LabCorp preliminary services at no cost in anticipation that LabCorp would ultimately protect their commission when a purchase or lease agreement was executed. (Gunn Dep. 164:12–186:21.) Typically, LabCorp would contact Gunn, he would show or list properties, arrange for the lease or purchase, and then receive payment when the transactions closed. (Gunn Dep. 164:12–186:21.) In transactions where Gunn represented LabCorp as a lessee or tenant, the owner or landlord typically paid a commission to the listing agent, which then apportioned part of that commission to Gunn as the tenant's representative. (Gunn Dep. 164:12 – 186:21.) In this particular transaction, Gunn anticipated that Security National Properties ("SNP"), the landlord of the building LabCorp leased, would pay its broker a commission that would be split with Gunn & Associates. (Gunn Dep. 148:1–4.)

{7}    Gunn contends he was to be LabCorp's exclusive tenant representative on this project, but he is unable to identify the period in which this exclusivity would continue. (Gunn Dep. 27:6–10; 28:19–29:8.) Gunn admits that he and

LabCorp never agreed on a specific commission or a method for determining the amount of his commission, which was still negotiable. (Gunn Dep. 29:18–24.)

B. Gunn's Efforts to Procure a Lease

{8} In 2008, LabCorp began considering establishing a consolidated billing center. In August 2008, Aherron sent Gunn an email requesting Gunn to conduct a market search for office space for that center. (Gunn Dep. 26:25–27:10; Aherron Dep. 82:3–22, Ex. 1, Jan. 17, 2012.) Aherron specified the approximate number of people, workstations, offices, and other facilities LabCorp needed the space to accommodate, and also expressed several geographic market preferences. (Aherron Dep. Ex. 1.) At Aherron's request, Gunn prepared a "Tour Book" consisting of seventeen listed commercial properties which included the Salem Building in Greensboro, the property LabCorp ultimately leased. (Gunn Dep. 89:5–91:23.)

{9} In November 2008, Gunn showed LabCorp personnel several of the locations from the Tour Book, including the Salem Building. (Gunn Dep. 91:24–96:6; Aherron Dep. 90:8–17, 99:20–105:22.) After several of the early site visits, Aherron contacted Gunn to request a follow up meeting and Gunn's further assistance. (Aherron Dep. Ex. 7.)

{10} In December 2008, Gunn contacted the landlords of several properties listed in the Tour Book, including the Salem Building, and requested lease proposals for LabCorp. (Gunn Dep. 55:13–18.) SNP, the landlord of the Salem Building, submitted a proposal. (Aherron Dep. Exs. 12–13.) The lease proposal applied to nearly 113,000 rentable square feet, listed several different lease term options ranging from five (5) to ten (10) years, required a $50,000 security deposit, and contained an $800,000 "upfit allowance" for SNP to modify the building for LabCorp's use. (Compl. Ex. G.)

{11} At Aherron's request, Gunn compiled the various lease proposals into a spreadsheet and sent them to Aherron in January 2009. (Gunn 55:13–18; Aherron Dep. Exs. 16–17.) After reviewing the proposals, Aherron asked Gunn to prepare

more specific information on the Salem Building and the surrounding area. (Gunn Dep. 64:1–21; Aherron Ex. 18–19.)

{12}    Gunn admits that after completing the market search and sending Aherron the spreadsheet of lease proposals, neither Aherron nor anyone else from LabCorp asked him to negotiate with the landlord of the Salem Building. (Gunn Dep. 70:15–71:11.) As of his last active involvement in property evaluation, Gunn also knew that LabCorp had not approved the project internally and its search was still preliminary. (Gunn Dep. 94:14–21.)

{13}    Gunn had little to no experience in economic development incentives. (Gunn Dep. 72:10–74:25.) In March 2009, Gunn referred LabCorp to a third party to aid in securing incentives for the project. (Aherron Dep. Ex. 23; Gunn Dep. 72:10–74:25.) Over the next five (5) months, Gunn maintained periodic contact with LabCorp (through Aherron) and SNP about the Salem Building. (Aherron Dep. Exs. 25–28; Gunn Dep. 105:08–107:17.) In August 2009, Aherron told Gunn that LabCorp remained interested in leasing the Salem Building but would not be able to commit to a lease until early 2010. (Gunn Dep. 108:2–109:15; Aherron Dep. 172:1–10.)

{14}    Gunn acknowledges that neither Aherron nor anyone else from LabCorp ever instructed him on LabCorp's acceptable price range for a lease or the amount of "upfitting" LabCorp would need a landlord to make in order for the premises to be suitable for LabCorp's uses. (Gunn Dep. 50:10–51:4, 54:23–55:25.) Gunn also did not know LabCorp's acceptable terms concerning concessions and incentives for the lease term, specific rental rates or adjustments, or allocation of operating expenses between LabCorp and the landlord. (Gunn Dep. 45:3–46:12, 48:5–49:3.)

{15}    On the other hand, Aherron never told Gunn to stop working on the lease project or expressly advised him that he was not LabCorp's representative for the lease. (Aherron Dep. 168:9–172:16.) While working on a different project for LabCorp, Gunn learned of the possibility that LabCorp was working with another broker on a lease of the Salem Building. (Gunn Dep. 113:18–117:3.) Gunn and

Aherron then spoke, at which time Aherron informed Gunn that, unbeknownst earlier to Aherron, LabCorp was working on the transaction with Simpson Schulman & Beard, LLC ("SS&B"), a firm that provides real estate brokerage and economic development services. (Gunn Dep. 113:18–117:3.)

{16}    In December 2009, Jon Kirby, an employee of SNP, called Gunn and asked him if LabCorp was compensating him for serving as a broker on the Salem Building deal. (Gunn Dep. 120:1–18.) Later that month, Aherron assured Gunn that he would receive a commission on the transaction. (Gunn. Dep. 122:6–123:11.)

### C. LabCorp's Lease of the Salem Building

{17}    In April and May of 2009, LabCorp began discussing economic incentives for the call center project with SS&B. (Beard Aff. ¶ 3.) On August 24, 2009, LabCorp and SS&B entered a written agency agreement, after which SS&B began working on the project. (Beard Aff. ¶¶ 3–4; Schulman Aff. ¶ 3.)

{18}    Like Gunn, SS&B analyzed several possible real estate options for LabCorp and concluded that the Salem Building was the best option. (Schulman Aff. ¶¶ 3, 7.) At that time, however, SS&B and LabCorp had not yet determined the essential terms of a potential lease, because LabCorp would not go forward with the project without receiving economic development incentives. (Beard Aff. ¶ 6.) Beard solicited economic development incentive proposals for LabCorp's project from several local governments and prepared a preliminary report on those efforts in October 2009. (Beard Aff. ¶ 5.)

{19}    Throughout November and December 2009, SS&B continued working to close a lease for the Salem Building even though LabCorp had not yet internally approved the project. (Schulman Aff. ¶¶ 4–5.) As negotiations continued in January 2010, LabCorp almost withdrew from negotiations because of the landlord's inability to fund an "upfit allowance" commitment to modify the building for LabCorp's use during the lease. (Schulman Aff. ¶¶ 5–6.) SS&B developed a solution to address the upfitting concern, and LabCorp executed the lease

agreement for the Salem Building on January 28, 2010. (Schulman Aff. ¶ 5–6.) In the executed lease agreement, LabCorp leased nearly 74,000 square feet of space, agreed to a fifteen-year, three-month term with options for three additional five-year terms, SNP provided $1,500,000 in tenant-upfit allowance, and LabCorp did not have to pay a security deposit.

## III.    ANALYSIS

{20}    Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and submitted affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. N.C. Gen. Stat. § 1A-1, Rule 56(c) (2013); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

{21}    The moving party must demonstrate the absence of a triable issue and does so either: "(1) by showing that an essential element of the opposing party's claim is non-existent; or (2) by demonstrating that the opposing party cannot produce evidence sufficient to support an essential element of the claim or overcome an affirmative defense which would work to bar its claim." *Wilhelm v. City of Fayetteville*, 121 N.C. App. 87, 90, 464 S.E.2d 299, 300 (1995) (citing *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 414 S.E.2d 339 (1992)).

{22}    If the moving party carries this burden, the non-moving party "must 'produce a forecast of evidence demonstrating that the [non-moving party] will be able to make out at least a prima facie case at trial.'" *Roumillat*, 331 N.C. at 63, 414 S.E.2d at 342 (quoting *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989)); *Rankin v. Food Lion*, 210 N.C. App. 213, 217, 706 S.E.2d 310, 313–14 (2011); *see also* N.C. Gen. Stat. § 1A-1, Rule 56(e) (non-moving party "must set forth specific facts showing that there is a genuine issue for trial."). This forecast "may not rest upon the mere allegations or denials of [a] pleading." N.C. Gen. Stat. § 1A-1, Rule 56(e).

A.  Breach of Contract and the Implied Covenant of Good Faith and Fair
    Dealing

{23}    LabCorp contends that Gunn is bound by his prior testimony concerning his course of dealing and implied contract with LabCorp, during which he failed to identify the essential, material terms necessary to have a binding, enforceable agreement.  Gunn contends he has presented a forecast of evidence showing an enforceable agreement with sufficiently definite terms.

{24}    If Gunn could provide the necessary terms for an oral or implied-in-fact brokerage services contract, it might be enforceable even if not reduced to writing. *See Scheerer v. Fisher*, 202 N.C. App. 99, 104–05, 688 S.E.2d 472, 475–76 (2010) (citing *Lamb v. Baxter*, 130 N.C. 67, 68, 40 S.E. 850, 851 (1902)) (holding that real estate brokerage contracts need not be in writing).[2]  "A 'contract implied in fact,' . . . arises where the intention of the parties is not expressed, but an agreement in fact creating an obligation is implied or presumed from their acts, or [. . .] where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." *Snyder v. Freeman*, 300 N.C. 204, 217, 266 S.E.2d 593, 602 (1980) (citation omitted); *Anderson Chevrolet/Olds, Inc. v. Higgins*, 57 N.C. App. 650, 654, 292 S.E.2d 159, 161–62 (1982).  However, any contract—including an oral or implied-in-fact contract—must contain sufficiently definite material terms in order to be enforceable. *See, e.g.*, *MCB Ltd. v. McGowan*, 86 N.C. App. 607, 608–09, 359 S.E.2d 50, 51 (1987) ("[A]ny contract provision . . . failing to specify either directly or by implication a material term is invalid as a matter of law.").

{25}    Gunn's testimony concerning his historical course of dealing with LabCorp and his understanding of the terms of his alleged agreement with LabCorp

---

[2] Any oral or implied brokerage agreement between Gunn and LabCorp had to be formed before the lease transaction at issue closed in January 2010.  Although "an agreement for broker services" must now be "reduced to writing and signed by the party to be charged," N.C. Gen. Stat. § 93A-13 (2013), that provision does not apply to agreements entered before October 1, 2011, *Scheerer v. Fisher*, No. COA 12-1002, 2013 N.C. App. LEXIS 408, at *14 (N.C. Ct. App. May 7, 2013) (unpublished) (citing Act of June 15, 2011, ch. 165, sec. 2, § 93A-13, 2011 N.C. Sess. Laws 649, 653).

does not identify the material terms necessary to support finding any agreement binding LabCorp to Gunn as its agent and obligating it to pay Gunn a brokerage commission.  In his own testimony, the only terms Gunn identified are that LabCorp requested him to explore commercial leasing opportunities for a call center, LabCorp engaged him as its exclusive agent for some indeterminate time, and LabCorp was obligated to pay him a commission.  Gunn has not identified, through his own testimony or any other evidence in the record, the time period of any exclusivity, nor has he identified the amount of his commission or a method of determining that amount.  Plaintiffs have not forecast or tendered any additional evidence that would supply these terms.  Without any evidence as to the existence or substance of these essential material terms, there simply is no binding agreement that the court can enforce.  *See Brawley v. Brawley*, 87 N.C. App. 545, 550, 361 S.E.2d 759, 762 (1987) (citing *Howell v. C. M. Allen & Co.*, 8 N.C. App. 287, 289, 174 S.E.2d 55, 56 (1970)) (noting that personal services agreement is not binding when it fails to state a price term or a method for determining price).

{26}    Thus, LabCorp is entitled to summary judgment on Plaintiffs' breach of contract claim.  It follows that LabCorp is also entitled to summary judgment on Plaintiffs' claim for breach of the implied contractual covenant of good faith and fair dealing arising out of that alleged contract.  *See, e.g.*, *Suntrust Bank v. Bryant/Sutphin Props., LLC*, 732 S.E.2d 594, 603 (N.C. Ct. App. 2012) (citing *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)).

B.  Procuring Cause

{27}    A broker may recover a commission under a procuring cause theory "whenever he procures a party who actually contracts for the purchase[3] of the property at a price acceptable to the owner.  If any act of the broker in pursuance of his authority to find a purchaser is the initiating act which is the procuring cause of

---

[3] Neither party contends that a "procuring cause" claim does not apply to brokerage services in connection with a lease.

a sale ultimately made by the owner, the owner must pay the commission" unless the contract provides otherwise. *S&W Realty & Bonded Commercial Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 250–51, 162 S.E.2d 481, 491 (1968) (citations omitted). "The broker is the procuring cause if the [transaction] is the direct and proximate result of his efforts and services," which means the broker must cause "a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker." *Id.* (citations omitted).

{28} A break in continuity will defeat a procuring cause claim. For example, when another broker closed the transaction on different terms than those presented by plaintiff-broker, the second broker's involvement was a "direct intervention" that broke "the chain of events set in motion by" the first broker. *Hecht Realty, Inc. v. Whisnant*, 41 N.C. App. 702, 708, 255 S.E.2d 647, 650 (1979). Thus, the first broker could not, as a matter of law, prove "that it was the procuring cause of the ultimate sale of" the property. *Id.* (reversing trial court's judgment for failing to grant motion for directed verdict to defendant on procuring cause claim).

{29} Similarly, a broker who "originally put the purchaser in contact with" the landowner was not the procuring cause of the sale occurring sixteen months later, because the landowner arranged for the sale of an additional lot and hired a different broker to complete the transaction. *Burge v. First S. Savs. Bank*, 114 N.C. App. 648, 650, 442 S.E.2d 552, 554 (1994) (citing *Hecht Realty, Inc.*, 41 N.C. App. 702, 255 S.E.2d 647).

{30} The broker seeking compensation as the procuring cause also must find a counterparty "ready, willing, and able to enter the transaction *on the terms specified by the principal.*" *Id.* (emphasis added). "If the details of the terms" on which the principal would enter into a contract "are never given to the broker . . . , he is precluded from producing a . . . ready, able and willing [counterparty] on the terms fixed by the principal." *Thompson-McLean, Inc. v. Campbell*, 261 N.C. 310, 314, 134 S.E.2d 671, 675 (1964) (citation omitted).

{31}     LabCorp contends that SS&B's involvement in the transaction, which ultimately closed on terms different than those presented in the initial lease proposal Gunn solicited from SNP, was a "direct intervention" in any chain of events initiated by Gunn that may have resulted in the lease.  LabCorp also contends that it never authorized Gunn to negotiate with SNP on its behalf for a lease of the Salem Building, and that it never provided Gunn with the terms on which it would enter a lease.

{32}     The court concludes that LabCorp's position is correct.  SS&B's involvement in negotiating the lease, which differs substantially from SNP's original proposal to Gunn, precludes Gunn from proving he was the procuring cause of the lease.  Gunn's involvement in the transaction, outside of a few follow-up emails, largely ended in March 2009.  In August 2009, LabCorp engaged SS&B to assist it in working towards completing the project, in large part because SS&B offered economic development and real estate brokerage services.  Although Gunn referred LabCorp to another person who could provide economic development services, he acknowledges that he did not have expertise in the area.  Once engaged, SS&B worked over the next several months to finalize the transaction.

{33}     The terms of the final lease agreement differ substantially from the terms contained in the non-binding proposal SNP originally sent to Gunn.   In the final agreement, LabCorp leased nearly 30,000 fewer square feet of space than in the original proposal, the lease term was longer than the original proposal, SNP did not require LabCorp to pay a security deposit, and SNP provided an additional $700,000 in tenant upfit allowance to LabCorp.  These are not minor or insignificant variations in immaterial terms—they are substantial, material changes that fundamentally affected LabCorp's decision to enter the lease.  Gunn has presented no evidence that he was involved in negotiating these changed terms.  Rather, the uncontested evidence shows SS&B finalized the transaction during late 2009 and early 2010.  Like in *Hecht Realty*, Gunn's initial involvement cannot, as a matter of law, support submitting the issue of procuring cause to a jury where the "direct intervention" of another broker who negotiated the transaction clearly broke

any "chain of events set in motion by" Gunn. *See Hecht Realty, Inc.*, 41 N.C. App. at 708, 255 S.E.2d at 650.

{34}     Gunn's testimony also makes clear that LabCorp never provided him with the terms on which it would enter the lease.  Neither Aherron nor anyone else from LabCorp instructed Gunn to attempt to negotiate a lease with SNP for the Salem Building.  Gunn also did not know LabCorp's acceptable price range for a lease, the amount of "upfitting" or upfit allowance LabCorp would require from a landlord, any rent concessions and incentives for the lease term, specific rental rates or adjustments, or allocations of operating expenses between LabCorp and the landlord.

{35}     LabCorp has presented affidavit testimony that the tenant upfit allowance was crucial to finalizing the lease.  Obviously, the price term is also material to the lease.  Gunn never received instruction from LabCorp as to either of these crucial terms, in addition to the other terms described above.  Gunn also has not challenged this evidence or forecasted any countervailing testimony.  Gunn simply never received "details of the terms" upon which LabCorp would lease the Salem Building, so he could not, as a matter of law, have procured a ready, willing, and able landlord for LabCorp. *See Thompson-McLean, Inc.*, 261 N.C. at 314, 134 S.E.2d at 675.

{36}     In sum, LabCorp is entitled to summary judgment on Plaintiffs' procuring cause claim.

C. *Quantum Meruit*

{37}     The court must now determine whether Plaintiffs can proceed on a *quantum meruit* claim when they are not entitled to receive a commission either by express or implied contract or under a theory of procuring cause.

{38}     The general elements of a *quantum meruit* claim are well settled.  "To recover in *quantum meruit*, a plaintiff must first show that (1) services were rendered to the defendant; (2) the services were knowingly and voluntarily

accepted; and (3) the services were not given gratuitously." *James River Equip., Inc. v. Tharpe's Excavating, Inc.*, 179 N.C. App. 336, 346, 634 S.E.2d 548, 556 (2006) (quoting *Wing v. Town of Landis*, 165 N.C. App. 691, 693, 599 S.E.2d 431, 433 (2004)). More specifically, "*quantum meruit* claims require a showing that both parties understood that services were rendered with the expectation of payment." *Wing*, 165 N.C. App. at 693–94, 599 S.E.2d at 433 (quoting *Scott v. United Carolina Bank*, 130 N.C. App. 426, 429, 503 S.E.2d 149, 152 (1998)). *Quantum meruit* enables a party to recover the reasonable value of services rendered. *E.g. Ron Medlin Constr. v. Harris*, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010).

{39}    LabCorp contends that "procuring cause" is an essential element of a *quantum meruit* claim where the essential claim is that the broker is entitled to a commission. The court agrees that *quantum meruit* is not a "back-door" pathway to a commission. The Court of Appeals has held that a broker's *quantum meruit* claim seeking recovery of a commission could not proceed to the jury where the evidence showed that the broker "was [not] the procuring cause of the sale." *Horack v. Southern Real Estate Co.*, 150 N.C. App. 305, 312, 563 S.E.2d 47, 52 (2002). The court does not conclude, however, that *Horack*'s holding necessarily precludes recovery in *quantum meruit* of the reasonable value of services rendered when the broker is not a procuring cause of a transaction.

{40}    Typically, a broker's entitlement to a commission depends upon the existence and terms of an express contract or a procuring cause theory arising out of a contract. In such a case the existence of a contract precludes any *quantum meruit* recovery. *See, e.g., id.* at 311–12, 563 S.E.2d at 52 (citing *Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998)) (affirming dismissal of *quantum meruit* claim where express contract controlled agency relationship related to transaction at issue). Here, however, there is evidence of LabCorp requesting and accepting services from Gunn specifically related to leasing the Salem Building.

{41}    It is unclear whether Plaintiffs, if allowed to proceed into discovery, will be able to develop evidence showing both that LabCorp accepted services for which both Parties expected there would be payment and an evidentiary basis for

measuring the reasonable value of those services. The court also cannot conclude that the testimony from the prior action necessarily establishes that Plaintiffs cannot develop such evidence.

{42} While the court has already concluded that Plaintiffs cannot recover their requested commission on the lease transaction, it is premature to foreclose some lesser recovery, measured by competent evidence, for the reasonable value of services rendered and accepted. *See Charlotte-Mecklenburg Hosp. Auth. v. Talford*, 366 N.C. 43, 48–49, 727 S.E.2d 866, 870 (2012) (describing evidentiary standards for establishing reasonable value of services). Thus, the court denies LabCorp's Motion for Summary Judgment as to Plaintiffs' *quantum meruit* claim.

D. Section 75-1.1

{43} A section 75-1.1 claim requires showing an unfair or deceptive act or practice, in or affecting commerce, that proximately caused plaintiff's injury. N.C. Gen. Stat. § 75-1.1; *see, e.g., Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87–88, 747 S.E.2d 220, 226 (2013). In *Burge*, the court affirmed dismissal of a section 75-1.1 claim involving similar facts to those presented here. *See generally* 114 N.C. App. 648, 442 S.E.2d 552. The court affirmed dismissal of a procuring cause claim and concluded that "defendant's sale of the property without plaintiffs' involvement" did not support a section 75-1.1 claim. *See id.* at 651, 442 S.E.2d at 554.

{44} Gunn contends that LabCorp's hiring of another broker and failure to tell him he would not receive a commission after accepting the benefits of his prior work support a section 75-1.1 claim. These factual contentions are essentially the same contentions underlying Gunn's other causes of action. Gunn has provided no evidence of any conduct by LabCorp that the court could conclude is unfair or deceptive. Accordingly, the court grants summary judgment in LabCorp's favor on Plaintiffs' section 75-1.1 claim.

## IV.   CONCLUSION

{45}   For the reasons expressed above, Defendant's Motion for Summary Judgment is DENIED as to the fifth claim for relief seeking recovery under a theory of *quantum meruit*.  Defendant's Motion for Summary Judgment is GRANTED as to all other claims for relief, and those claims are HEREBY DISMISSED WITH PREJUDICE.  The court will convene a status conference to establish a Case Management Order related to the remaining *quantum meruit* claim.

IT IS SO ORDERED this 3rd day of July, 2014.